## MOORE v. FORD MOTOR CO.

District Court, S. D. New York. August 8, 1928.

Leonard M. Wallstein and Ralph M. Frink, both of New York City, for plaintiff.

Nicoll, Anable & Nicoll, Delancey Nicoll, and Delancey Nicoll, Jr., all of New York City, for defendant.

GODDARD, District Judge. This is a suit by the plaintiff to enjoin the defendant from using its "Ford weekly purchase plan," and for an accounting, on the ground that the plaintiff conceived and devised an original and novel invention and trade secret, to be used in connection with the sale of automobiles and tractors, which had never been used in the sale of automobiles or in the sale of other commodities; that plaintiff communicated this plan to the defendant by letter, and that the defendant appropriated his plan and copied his letter, and made use of them to its profit.

The claims of the plaintiff are based upon letters which passed between the plaintiff and the defendant, and upon the circular letter sent out by the defendant to the dealers in Ford automobiles and tractors, and put into effect March 30, 1923. These, exclusive of instructions to the dealers as to the placing of advertising, etc., and which were included with the circular letter, but which are not here material, are as follows:

"Washington, D. C., October 14, 1922.

"Mr. Henry Ford, Ford Automobile Company, Detroit, Mich.—Dear Sir: I would very much like to have an opportunity to submit to you a sales plan whereby I believe it would be possible to sell a greatly increased number of Fords.

"The plan, because of its simplicity, convenience, and appeal, would enable your salesmen and agents to reach effectively a very large class of people who have not heretofore been available as prospective purchasers. Those to whom it should appeal strongly are the great number of small wage-earners of the country.

"The plan contains a human touch directly in line with other Ford policies, which have gained for the Ford companies such an enviable reputation for generosity and fairness.

"If it is your intention to be in Washington in the near future, I would be glad to present the idea personally. If you do not expect to be here shortly, I would be pleased to go to Detroit, or to send you a detailed outline of the plan.

"Yours very truly,
"[Signed] Edward G. Moore,
"952 Munsey Building, Washington, D. C."

"Ford Motor Company,
"Manufacturers of Automobiles, Trucks and Tractors,
"Detroit, U. S. A., Oct. 18, 1922.

"Mr. Edward G. Moore, 952 Munsey Bldg., Washington, D. C.—Dear Sir: Your letter of Oct. 14 to Mr. Henry Ford has been referred to this department for attention, and we thank you for your letter.

"If you will kindly write us in detail regarding the plan which you have in mind for increasing the sale of Ford cars, understanding that in doing so there would be no obligation on our part, we will be very glad to give the matter our careful attention, and advise you whether or not we would be interested in the plan.

"Ford Motor Company,
"[Signed] L. E. De Forest,
Sales Department."

"952 Munsey Building, Washington, D. C.
"October 25, 1922.

"Mr. L. E. De Forest, Sales Department, Ford Motor Company, Detroit, Mich. Dear Sir: Referred to R. In compliance with the suggestions contained in your letter of October 18th, I herewith submit the sales plan referred to in mine of October 14th.

"The plan has to do with the sale of cars on a partial payment basis, by a method that is much wider in scope than any now employed. Briefly, it calls for an offer by the Ford Motor Company or its agents somewhat as follows:

"Ford Motor Company will pay you 10 per cent. per annum on deposits applied to the purchase of a Ford.

"A deposit of $25 each month for six months with any Ford agent covers the initial payment and secures delivery of a Ford.

"The balance of the payments on easy terms.

"Deposits withdrawn will be paid for at the rate of 4 per cent. per annum.

"An easy and convenient method of buying a Ford.

"Get details of this offer from any Ford agent.

"The deposit figure of $25, in the above-

suggested offer is only approximate. It would, of course, have to be revised to apply to the different types of cars and tractors. It would also vary in different localities, so as to take care of freight rates, etc., as the deposits would most likely be based on the delivered prices of the cars.

"In no event, however, should the interest rates of 10 per cent. on deposits and 4 per cent. on refunds be lowered. It might even be possible to increase them; I believe it could be done advantageously.

"On the supposition that the interest payments would have to be borne by the agents—that the Ford Motor Company would not care to reduce their prices to agents to this extent—let us see what these payments would amount to:

Interest on $25 at 10% per annum for 5 months.. $1.04
Interest on $25 at 10% per annum for 4 months.. .83
Interest on $25 at 10% per annum for 3 months.. .62
Interest on $25 at 10% per annum for 2 months.. .41
Interest on $25 at 10% per annum for 1 month... .21
                                                 ——
    Total ...................................... $3.11

"You will note that the above takes care of only five payments. This is so, because the last payment would not bear interest, and the interim between the first and last would be only five months.

"This sum of $3.11 would be offset by the advantage the agents would derive from having use of the money deposited. The clerical work entailed would be practically nil. The net additional cost, if there were any, and I am inclined to believe there would not be, would be very small indeed, compared with the advantages of this method of selling cars.

"I would like to set forth what I consider advantages of this plan:

"(1) It best applies to Ford cars, because of the low prices at which they are marketed; it keeps the monthly deposit low.

"(2) An offer by the Ford Motor Company to pay 10 per cent. interest would have great advertising value.

"(3) Such an offer would be a novel and unique proposition, but entirely in line with Ford progress.

"(4) It would immediately bring forth inquiries and so disclose many possible purchasers. People are always interested in any investment on which they receive a high rate of interest. They want security and as high a yield as obtainable, and backed by Ford the offer would be unquestioned.

"(5) It would give agents and salesmen a new method of selling cars.

"(6) It would open an entirely new field of operation for agents and salesmen. With this offer available, no salesmen need be disarmed by a statement from the person approached that he or she hasn't the money to make the initial payment now required under present conditions governing the sale of cars. A presentation to these people of the 10 per cent. plan would in many cases bring results. Simple advice to save until the necessary amount is accumulated won't get the salesman very far with his man, but the submission of a definite system, possessed of attractive features, will make far headway with this class.

"(7) It would tend to influence people who are now saving for a car to deposit their money with agents, and so get the benefit of the high rate of interest.

"(8) It would not interfere in any way with any present method of selling cars. As I understand it, sales are now made for 'cash down,' or the payment of a sufficient amount to secure delivery of the car and the balance in 6 or 12 monthly installments. This new method could be made to fit in perfectly with the present partial payment plan.

"(9) Summing up, it seems to me that the putting of this plan into operation would be good business for the Ford Motor Company, Ford agents, Ford salesmen, and Ford purchasers. And while Mr. Ford does not need any additional prestige, an offer by him to pay through his company a 10 per cent. interest rate would be directly in line with his policy to increase payments while others are reducing them.

"The above is a general idea of what I had in mind. I understand that it is subject to amendments and eliminations, but, if it is usable, I would like very much to aid in perfecting it. However, as called for in your letter, I am writing you with the understanding that there is no obligation on your part. You say in your letter that you will advise me whether or not you are interested in the plan and I hope you will do this.

"Yours very truly,
        "[Signed]   Edward W. Moore.
                    "Edward G. Moore.
"952 Munsey Building, Washington, D. C.
    "Note.—See next page.
    "P. S.—If use is to be made of this plan, it should be offered to the public as soon as possible. This is suggested, because it might appeal to a great many who go into bank Christmas savings clubs who would save for a Ford instead. In addition, deposits made now, before the first of the year, would insure delivery of the car in the

spring or early summer, when it is most desired. E. G. M."

"Mr. De Forest. General Letter.
"Sales Subject No. 1363.
"Ford Weekly Purchase Plan.
"From Home Office. Date March 30, 1923.

"We have repeatedly called attention to the enormous field for the marketing of Ford products, and retail deliveries of over 100,-000 cars per month the past year indicate that our dealers are more fully realizing the possibilities. But have you ever analyzed the field we have been working? Ford products have been delivered to *cash buyers and those who were able to make a down payment on one of the many deferred payment plans*, and while this field has not by any means been thoroughly worked, and our entire organization realizes the enormous volume which we should continue to steadily receive from it in the way of immediate retail sales, still there is a much larger field which has NEVER BEEN WORKED BY ANY ONE.

"There are over 20,000,000 wage-earners in this country alone, who receive annual incomes ranging from $1,000 to $2,000, the large majority of whom do not own automobiles—and no attempt has ever been made to work this immense field—to make it possible for this multitude to gratify that strong desire to own an automobile.

"Full realization of the fact that these millions WANT Ford cars is quickly evident, if you will but sound out the field. Stop the first individual you meet, for example, and make this inquiry, 'Do you own an automobile?' If the answer is in the negative, ask if he would like to own one, and invariably the answer is an emphatic 'Yes.' Your next question will naturally be, 'When do you expect to purchase a car?' and the answer in practically every case will be, 'I guess it will be several years before I can buy a car.' To your next question, 'What car would you purchase?' the answer in most cases will be, 'A Ford car'— and naturally so because of its outstanding value and EXTREMELY LOW PRICE.

"IT IS APPARENT, THEREFORE, THAT MOST OF THESE PEOPLE INTEND TO BUY CARS AT THE VERY FIRST OPPORTUNITY.

"That 'first opportunity' is now presented through the FORD WEEKLY PURCHASE PLAN, a simple savings plan that not only makes it possible, but actually EASY, for this vast army of people to make automobile ownership an actual realization—and in a surprisingly short time.

"There is no question about the success and drawing power of a systematic savings idea. During the past year, for example, $190,000,000 were deposited in banks by people throughout the country in 'Christmas savings funds.' And without any real incentive other than the purchase of gifts for others—but think of the added impetus of a plan where the individual is accumulating funds to purchase a *Ford car for himself*.

"Its drawing power is bound to be felt by practically every wage-earner in the United States.

"THE MORE YOU ANALYZE THE IMMENSITY OF THIS BIG UNWORKED FIELD, THE MORE YOU WILL VISUALIZE ITS WONDERFUL POSSIBILITIES. AND THIS PROSPECTIVE BUSINESS IS ALL IN ADDITION TO THE ENORMOUS FIELD NOW AVAILABLE FOR IMMEDIATE BUSINESS THROUGH CASH PAYMENTS AND THROUGH THE DEALER'S REGULAR DEFERRED PAYMENT PLAN.

"FORD WEEKLY PURCHASE PLAN.
"Details of the Plan—

"The Ford Weekly Purchase Plan provides a means for the purchase of a Ford car, truck, or Fordson tractor through the consistent weekly savings of a small amount —first deposit and weekly payment as low as $5 (less, if necessary)—which will be deposited in a local bank and bear interest, accumulating until such time as the total amount equals the current purchase price of the Ford car, truck, or tractor selected. The plan also includes the co-operation of the banks with whom our dealers are doing business, in that they will be asked to advertise in conjunction with a campaign which will be carried on by Ford dealers direct, advertising copy of which is inclosed and details explained in supplemental letter attached.

"These bank and dealer advertisements appearing simultaneously throughout the country will be the first announcement of the plan to the public, and with the concentration of our entire organization there is bound to be an avalanche of inquiries received by both banks and dealers, which emphasizes the importance of having both the banks and dealers properly lined up in advance for the handling of such inquiries in an efficient and intelligent manner. In soliciting this class of business, inquiries will

be handled in the usual way, except that the customer's signature will be obtained on a special card form, instead of the regular retail buyer's order. These special cards will be furnished from here on the same plan that prospect cards are handled, making a nominal charge to the dealer, who will supply a sufficient quantity to the banks. Copy of this card is attached, and is to be used in triplicate, one copy for the customer, one for the bank and one for the dealer.

"The dealer, in enrolling a customer, will take a set of three cards, indicating on each the type of car, truck, or tractor selected, the amount of first deposit and amount to be paid weekly, and will insert the name of the bank in the space provided, and enter the amount of first payment on the reverse side of all three cards, with initials of the person receiving the deposit. The customer will then sign all three cards. The balance of the form, you will note, provides for salesman's name, date, and for the acceptance and approval of the dealer. One copy of the card will then be given to the customer; the other two copies, together with deposit, will be turned over to the bank, who will initial the dealer's copy to indicate the receival of deposit, returning it to him for his files; the third copy to be retained by them for the entry of subsequent payments which will be handled in like manner.

"The bank, in enrolling a customer, will fill in three copies of the card in the same manner, filling in the name of their bank, and inserting the name of the dealer who will effect delivery of the car, truck, or tractor specified. The bank will then obtain the customer's signature on all three copies of the card, returning one copy to the customer after receipting for the deposit, and will place one copy in their files for their own permanent records, turning one copy over to the dealer; such enrollments naturally being prorated by the bank in case they are co-operating with more than one dealer.

"Subsequent payments will be handled in a like manner, except that, when deposits are made direct to the banks, the dealer will see to it that his copy of customer's card is brought up to date from time to time. From this you will note that an accurate record will be kept not only of the first deposit, but of all subsequent payments by both the bank and dealer, as well as the customer.

"There is a distinct advantage, of course, in having a customer come into the dealer's place to make his weekly deposits;

he will see new cars on display, and in many cases possibly increase his deposits in order to obtain delivery earlier. It will be to the dealer's advantage, therefore, to encourage customers who have been enrolled by the banks to make their subsequent deposits through the dealer in order to keep in close touch with them. In fact, a large number of dealers will want to place one of their own salesmen in the bank to obtain enrollments and insure the proper handling of prospects who make direct inquiry as a result of the advertising run by the banks.

"Withdrawals—

"The agreement specifies that withdrawals may only be made in cases of extreme emergency at the discretion of the bank and the dealer. 'Extreme emergency' should be construed to mean urgent need of funds on account of sickness, death, lack of employment, etc., and in all cases where withdrawals are requested, the dealer should be notified in advance by the bank, arrangements for which can be made at the time the plan is put into effect, so that proper investigation can be made, in order that the terms of the agreement may be lived up to. It is not our intention to conflict with any state laws, so banks will naturally handle in line with their regular policy.

"Interest—

"Interest is to be payable, as stated on the purchase agreement card, in accordance with the bank's regular savings rate, provided the payments are made REGULARLY. The word 'regularly' means weekly payments, but the bank may exercise its own judgment as to whether interest in any particular case should not be paid. The purpose of this provision is to encourage the customer to make his payments with regularity, in order to get the benefit of the accumulated interest.

"Delivery—

"Upon the completion of payments, or at such time as the amount deposited is to be applied as a down payment, the crediting of the money to the account of the dealer may be handled through the regular bank withdrawal form which can be supplied to dealers by the banks. The customer's signature to this form will automatically transfer the account to the dealer.

"Dealer Cancellations—

"In the event a change in representation is made and the dealer canceled has an accumulation of enrollments on this Plan, please make sure that the names of all such customers are turned over promptly to the successor of the canceled dealer so that

weekly payments may be continued in the regular way. If any cases arise where there is an unavoidable delay in getting the new representative started, customers should be notified to make weekly payments at the bank instead of at the dealer's place of business, until such time as the new dealer gets under way.

"Report of Enrollments—

"In order that we may know just what progress is made in each branch territory, not only for the purpose of comparing total branch results, but to determine the progress made in cities of similar potential possibilities throughout the country, we ask that you have all of your dealers make report to you through their regular 10-day report, indicating the number of enrollments received during the period covered by the report, individual dealer's accumulative enrollments being incorporated in manager's report in the space formerly used for reporting the Dearborn Independent subscriptions.

"FORD WEEKLY PURCHASE PLAN.

"Benefits to the Dealer—

"1st. It opens up an enormous NEW field of buyers with no second-hand cars to trade in.

"2d. It affords all-year-round employment for his entire sales force, eliminating the possibility of salesmen leaving because of our failure to make prompt deliveries during the heavy demand seasons.

"3d. It is a profitable income builder for salesmen, who will retain their connection with dealers because commissions will not be paid until deliveries of cars, trucks, and tractors are actually effected.

"4th. Permits of the actual selling of cars this year for delivery next year, giving dealers a more accurate basis for determining the new year's requirements.

"5th. Arouses new interest in salesmen who will assist dealers in determining estimates, because they will naturally want sufficient cars to protect both present and future enrollments.

"6th. It will be an incentive to the dealer and his entire organization for the more effort put forth the more the profit return.

"7th. It will afford a means of co-operation for the banks, not only in an advertising and a sales way, but in financing many worthy customers who might desire delivery of their car before all payments were completed.

"8th. It will assist dealers in obtaining more calls per salesman per day—and more calls per day mean more sales.

"FORD WEEKLY PURCHASE PLAN.

"Benefits to the Salesmen—

"1st. It will provide a steadily increasing income builder above present earnings.

"2d. It simplifies selling to a 'one-call basis,' because, if a prospect cannot be closed for immediate or future delivery, it is hardly conceivable that he cannot be enrolled in the Ford Weekly Purchase Plan for later delivery.

"3d. It greatly enlarges their sales opportunities which will be only limited by their own initiative and ability to apply themselves and WORK.

"4th. It practically places salesmen in business for themselves, as a steady accumulation of enrollments means potential profits and steady income. Think of the number of live salesmen who will have hundreds of enrollments booked this year and who will obtain their commissions when deliveries are effected next year! This indicates the tremendous possibilities of the plan for the salesmen to increase their incomes through devoting extra time to this NEW field, because practically every prospect approached will place his order either for immediate delivery, future delivery or enroll for later delivery.

"FORD WEEKLY PURCHASE PLAN.

"Benefits to the Bank—

"1st. It provides invaluable publicity through the solicitation of accounts by Ford dealers and their salesmen. Think of the organization of Ford dealers and Ford salesmen who will be actually soliciting accounts for the banks.

"2d. It provides contact with individuals entirely unknown to the banks in the past, paving the way for continued business with them in the future.

"3d. It opens a new field of loans to worthy customers, and the possibility of developing a deferred payment department, whereby instead of PAYING a saving rate of interest to the customer purchasing under this plan, they would be RECEIVING the loan rate of interest from him.

"Benefits to Our Company—

"The satisfaction of knowing that we have made it possible for this vast army of people to enjoy the benefits derived through the ownership of Ford products—a plan which, if intensely pushed, will create a tremendous sales wheel turning each month to effect deliveries of Ford products almost automatically to those who were enrolled months previously and which in a short time should amount to the absorption of a large

proportion of our proposed increased production.

"FORD WEEKLY PURCHASE PLAN.
"OTHER ADVANTAGES—
"Delivery before Payments are Completed—

"Visits to the dealer's place of business each week to take care of the regular payments are bound to spur the customer to greater effort in completing his payments—in fact, the new Ford cars on display in the dealer's showroom will in many cases create an irresistible desire to get immediate delivery, which can be arranged provided the deposits are sufficient to at least equal the necessary first payment on the dealer's or the bank's regular deferred payment plan.
"Bank's Willingness to Finance Deferred Payment Plans—

"Many banks co-operating with our dealers in carrying out this plan will be willing to finance the customer, should he decide to accept delivery before all payments are completed. The banks will in this event be RECEIVING the standard rate of interest on the unpaid balance, instead of PAYING the regular savings rate.

"Above are a few of the more important, immediate advantages and benefits of the Ford Weekly Purchase Plan to the customer, salesman, dealer, bank, and ourselves, not only to indicate to you its far-reaching possibilities, but also to emphasize strongly the big results which should and can be obtained through the concerted and co-operative activity of every one concerned.

"We want this plan announced simultaneously in all branch territories through the insertion of both dealer and bank advertisements on Sunday April 8th, and it is very important, therefore, that every one of your dealers be thoroughly informed at once concerning full details of the plan, which will give them an opportunity of talking it over with their local banks and making all necessary arrangements. This can be done by immediately outlining the plan in a letter to all of your dealers, but getting quick action in your branch city and other larger points, by calling a meeting of such dealers to personally explain full details of the plan to them and arouse strong enthusiasm on their part to put it over in a big way. These dealers should be selected, not only from the standpoint of the size of the community in which they are located, but also from the standpoint of the extent of the circulation of their local newspapers, so that announcements of the plan on April 8th will appear in all the larger newspapers having a combined circulation covering your entire territory.

"Right now is the time to lay our foundation for a BIGGER BUSINESS next year, and with 9,000 Ford dealers and 30,000 retail salesmen, not to mention thousands of banks, all vigorously pushing for enrollments in the Ford Weekly Purchase Plan, making it easy for millions of deserving families to enjoy the ownership of Ford products, there is every reason why an enormous volume of NEW BUSINESS should be piled up with no let-up in our present volume of cash and deferred payment sales.

"The more you get into the plan—think it over, analyze it and TALK IT to your roadmen, your dealers, their organizations and their bankers—the more it will actually GROW on you.

"The sales foundation is ideal—these millions of potential buyers want automobiles—we want them to have them and are supplying the plan whereby they can become owners within a short time. And it is clean, cash business for our dealers, with no second-hand cars involved.

"So throw yourself into the spirit of the whole plan—get your dealers lined up quickly and then commence a vigorous follow-up at once through your road force to keep your outside organization going at full speeed because every new enrollment will mean an additional advanced sale.

"Please acknowledge.

"W. A. Ryan, Manager of Sales.

"P. S.—Should any difficulties arise to interfere with the announcement being made in your territory on April 8th, WIRE us the particulars immediately. Otherwise, we will assume that the above will be carried out in every detail by your branch."

The answer of the defendant consists of a general denial, and the defenses—that the plaintiff's plan was not new and original, but had been in extensive use in the automobile trade and by Ford dealers; that the said "Ford Weekly Purchase Plan" was derived from sources other than the plaintiff's letter of October 25, 1922; that the material for and the preparation of the said "Ford Weekly Purchase Plan" was prepared entirely by its own employees, and that it did not copy plaintiff's letter of October 25, 1922, or appropriate the plaintiff's plan.

To determine the questions involved in the case, it is necessary to determine just what the property rights of the plaintiff are: First, as to plaintiff's literary rights in his

letter of October 25, 1922, and whether these rights were infringed by the defendant.

■ Mr. Moore's letter of October 25, 1922, was, of course, not copyrighted, but the common-law property right of an author in his manuscript gives him redress against any one who publishes it without his authority. Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 S. Ct. 722, 52 L. Ed. 1086. The author of a literary work or production "has a right to determine whether it shall be published at all, and if published, when, where, by whom, and in what form. This exclusive right is confined to the first publication. When once published it is dedicated to the public, and the author has not, at common-law, any exclusive right to multiply copies of it or to control the subsequent issues of copies by others." Palmer v. De Witt, 47 N. Y. 532, 7 Am. Rep. 480.

■■ The common-law property right exists only in works which have not been published within the meaning of the copyright acts and is a perpetual right. The statutes relating to copyright are intended to secure to the author the exclusive right in his work for a limited term of years which have been published in accordance with the statute. Caliga v. Inter Ocean Newspaper Co. (C. C. A.) 157 F. 186, affirmed 215 U. S. 182, 30 S. Ct. 38, 54 L. Ed. 150; Werckmeister v. American Lithographic Co. (C. C. A.) 134 F. 321, 68 L. R. A. 591; Wheaton v. Peters, 33 U. S. (8 Pet.) 591, 8 L. Ed. 1055; Baker v. Libbie, 210 Mass. 599, 97 N. E. 109, 37 L. R. A. (N. S.) 944, Ann. Cas. 1912D, 551; Drone on Copyright, p. 100. At common law, as well as under the copyright acts, it is the form, sequence, and manner in which the composition expresses the idea which is secured to the author, not the idea. White-Smith Music Co. v. Apollo Co., 209 U. S. 1, 28 S. Ct. 319, 52 L. Ed. 655, 14 Ann. Cas. 628; Stowe v. Thomas, Fed. Cas. No. 13,-514; Haskins v. Ryan, 71 N. J. Eq. 575, 64 A. 436.

■ The test of piracy is stated in 13 Corpus Juris, p. 1136, § 307, as follows:

"It has been laid down as the clear result of the authorities in cases of this nature that the true test of piracy is to ascertain whether the author of the alleged piratical work has in fact used the plan, arrangement, and illustrations of the copyrighted work as the model of his own work, with colorable alterations and variations only, to disguise the use thereof, or whether the work is the result of his own labor, skill, and use of common materials and common sources of knowledge open to all men, and whether the resemblances are either accidental or arising from the nature of the subject; in other words, whether defendant's work is quoad hoc a servile or evasive imitation of the copyrighted work, or a bona fide and original compilation from other common and independent sources. The question is always simply one of fact, whether defendant copied the matter from complainant's book or obtained it by his own skill and labor from the common source."

Again, the rule is expressed as follows in 13 Corpus Juris, pp. 1145, 1148, § 318:

"* * * As in the case of copyright in books or other literary works, the part taken must be material, and there must be a substantial identity, pro tanto, with the original composition in order to constitute piracy, and that identity must be due to copying and not to mere coincidence such as may exist even in the case of works independently produced. Where the two productions produced the impression on spectators that they were substantially the same, one will be held to be a colorable imitation of the other. But a substantial similarity, founded on coincidence, or the use of old or stock situations, or common sources, and not the result of piracy, direct or indirect, is insufficient to establish infringement; nor is the taking of a general idea or scheme sufficient."

With the above in view, a comparison is to be made between Mr. Moore's letter of October 25, 1922, and the alleged infringing circular letter, the "Ford Weekly Purchase Plan" published by defendant, at the same time taking into consideration the various circulars and advertisements previously published by Ford dealers and others in connection with plans similar to the plaintiff's for selling automobiles upon the installment basis. From an analysis of Mr. Moore's letter of October 25, 1922, it appears that the letter consists of a plan to sell automobiles and tractors on an installment plan, with an allowance of interest to the purchaser while accumulating the required amount for making down payment on the purchase price when the car is delivered, or, in event of the failure to accumulate a sufficient amount to make the purchase, the allowance of a lower rate of interest, and the letter also sets forth in a skillful manner the advantages claimed in such a plan for all concerned.

■ After a careful comparison of the Ford circular, sent out on March 30, 1923, **with**

Mr. Moore's letter of October 25, 1922, and an examination of the alleged evidence in detail of copying urged by the plaintiff, I am not convinced that plaintiff's letter was copied, or, to state it precisely, that the literary property which the plaintiff had in his letter was infringed by the defendant. While it is true that many of the expressions are more or less similar, the words and expressions were those which had long been used in connection with the advertising and promotion of sales in the automobile trade, as is shown by reading circulars and advertisements used by those in the automobile business before either the plaintiff's letter was written or the Ford Plan was published. It is probably a fair statement of the evidence to say that the plaintiff had familiarized himself more or less with current advertisements of installment plans for the sale of automobiles, and the many exhibits submitted by defendant indicate that its dealers had for years carried on a campaign of advertising their automobiles under various sales plans, and the arguments as well as many of the expressions have a common resemblance.

The "Ford Weekly Purchase Plan" covers about three times as much space as Mr. Moore's plan. There were essential differences between Mr. Moore's plan and the "Ford Weekly Purchase Plan." The fundamental idea of Moore's plan was the selling of automobiles and tractors on an installment basis. This, of course, was not new. Added to this were the terms, such as the rate of interest to be allowed to the intending purchaser, while a sufficient amount was being deposited to make the down payment and obtain possession of the automobile or tractor. This is not a new idea, nor were the reasons for such a rate new. Under Mr. Moore's plan, for the purpose of attracting prospective purchasers, a high rate of interest was to be paid on the deposit, and as Mr. Moore himself states, "In no event, however, should the interest rate of 10 per cent. on deposits and 4 per cent. on refunds be lowered." And in Mr. Moore's plan the deposit was to be made with the Ford dealer, who was to pay interest and have the use of the money meanwhile, and $25 was to be deposited each month for six months; while, under the "Ford Weekly Purchase Plan," the deposits were to be made with the local banks selected by the depositor, which were to pay the prevailing interest rates on all deposits, if regularly made, with the deposits as low as $5 a week, and neither the Ford Motor Company

nor its dealers were to have the use of the money.

There is also the positive testimony of Mr. Ryan, who was sales manager of the Ford Motor Company from 1918 to 1927, that he and Mr. Davis, of that department, prepared the material for the "Ford Weekly Purchase Plan"; that the only persons with whom he had discussed the plan before March 30, 1923, were Mr. Longley, the general counsel of the company, and Mr. Edsel Ford, when the plan was ready to be put in use; that he had never discussed Mr. Moore's letter with Mr. De Forest (the representative of the Ford Motor Company who had the correspondence with the plaintiff); that he had never seen the correspondence between Mr. Moore and Mr. De Forest, or heard of the Moore plan, until April, 1923, when plaintiff's telegram of April 8, 1923, was referred to him. He also states that he had several conferences with Dunham, of the Dime Savings Bank of Detroit, and obtained from him material used by him in the operation by his bank of a Christmas savings fund; that in formulating the "Ford Weekly Purchase Plan" he consulted a number of booklets and circulars, which had been used by Ford dealers and various automobile dealers, including a booklet entitled "Universal Car Sales Club," forms of contract used by the Covey-Ballard Motor Company, booklets of the Walsh Motor Car Company and Carondelet Motor Company, and that he himself had become familiar with plans similar to the "Ford Weekly Purchase Plan" which had been in operation by Ford dealers before that plan went into effect, as a result of his travels throughout the United States, visiting automobile dealers, and conferences with them.

Mr. De Forest, who had the correspondence with Mr. Moore, stated that his duties with the Ford Company, in 1922, consisted of handling the general correspondence which came to the sales department; that he had nothing whatever to do with the preparation of the "Ford Weekly Purchase Plan"; that he first learned of it when a typewritten copy of it was given to him, to have mimeographed and sent out with advertising material to the branches of the Ford Motor Company; that he never showed the correspondence which passed between Mr. Moore and himself to any one in the Ford Company organization until Mr. Ryan, some time after March, 1923, inquired for it.

Mr. Davis testified that he joined the

sales department of the Ford Motor Company in 1919, and that in 1922 he was acting as assistant to Mr. Ryan in the sales department; that he worked with Mr. Ryan in the preparation of the "Ford Weekly Purchase Plan"; that prior to March 30, 1923, he had never seen plaintiff's letter of October 25, 1922, or any of the correspondence.

Aside from the alleged infringement of the plaintiff's literary rights in the letter, which have been discussed above, plaintiff bases his right to recovery on the ground that the defendant has, in violation of the common law, appropriated plaintiff's idea, namely, his sales plan, and that this, like trade secrets or other valuable trade information, belongs to the plaintiff until it is publicly disclosed, and plaintiff contends that, in his communication of his plan to the defendant in his letter of October 25, 1922, there was merely a restrictive publication or a confidential disclosure, and that a court of equity, therefore, should protect the plaintiff, by requiring the defendant, if it used his plan, to account to him for the benefits it received. In support of this position, the defendant cites a number of cases, including Thompson v. Famous Players-Lasky Corp. (D. C.) 3 F.(2d) 707; Press Publishing Co. v. Monroe (C. C. A.) 73 F. 196, 51 L. R. A. 353, appeal dismissed 164 U. S. 105, 17 S. Ct. 40, 41 L. Ed. 367; Packard v. Fox Film, 207 App. Div. 311, 202 N. Y. S. 164; Pollard v. Photographic Co., 40 Ch. Div. 345; Tabor v. Hoffman, 118 N. Y. 30, 23 N. E. 12, 16 Am. St. Rep. 740. However, these cases have to do with either the piracy of the literary rights of the plaintiff, which have been discussed above, and are aside from the point now under consideration, or they refer to cases where there was a confidential relationship existing, such as employer and employee, or a situation of like nature. In the defendant's letter of October 18th to the plaintiff, in which the defendant invites the plaintiff to write them regarding his plan, it states, "Understanding that in doing so there will be no obligation on our part," and in plaintiff's letter of October 25th, he says—last paragraph:

"This is the general idea I had in mind. I understand it is subject to amendments and eliminations, but, if it is usable, I would like very much to aid in perfecting it. However, as called for in your letter, I am writing you with the understanding that there is no obligation on your part."

Just what the plaintiff had in mind is not clear; that his desire was to be employed by the defendant "to aid in perfecting it" is a likely inference.

I do not think that, upon the facts, it could be held that there was a restricted disclosure of his plan by Mr. Moore, or a situation where a court of equity should attempt to extend defendant's obligation when plaintiff himself said none existed. I think it extremely doubtful whether the Ford Motor Company would have ever agreed to have permitted Mr. Moore to impart to it a plan in the nature of the one he advocated, with any limitation of its right to put into effect the "Ford Weekly Purchase Plan." The parties were dealing at arm's length, though, of course, the defendant owed to the plaintiff the duty of not violating plaintiff's common-law literary rights in his communication discussed above. It is frequently not merely the idea, but it is the ability to carry it out successfully, that produces results. The plaintiff need not have disclosed his plan, except under such conditions as he himself imposed. The question of unfair competition is not involved. I think it would be going further than the courts have gone or should go, in the absence of some agreement, or a fiduciary relationship, to hold that, where one imparts a mere idea to another, and that one acts upon it and profits thereby, he is liable for the profits derived. Obviously, a contrary rule would place a serious limitation upon industry, and would be impractical, and, of course, no one need disclose his idea, except upon his terms. This view is in line with the following cases:

In Bristol v. E. L. A. Society, 132 N. Y. 264, 30 N. E. 506, 28 Am. St. Rep. 568, the plaintiff in his complaint alleged in substance that, to induce the defendant to employ him, he wrote the defendant a letter, and in it communicated to the defendant in confidence a new system of soliciting insurance business; that the defendant, without the plaintiff's knowledge, commenced the use of the system and continued its use against his protest, after discovery, and thereby obtained a large amount of business. Landon, J., writing the unanimous opinion of the court, 132 N. Y. at pages 266, 267, and 268 (30 N. E. 507) said:

"Assuming, without deciding, that if the defendant has wrongfully appropriated, or converted to its own use, the plaintiff's property, or infringed upon his property rights or privileges, and has, without right, made use of them, it ought to respond to the plaintiff for such use, and should render an account to him respecting the same, the

question arises upon this complaint whether the subject of the appropriation and use constituted property or property rights of the plaintiff. * * *

"Without denying that there may be property in an idea, or trade secret or system, it is obvious that its originator or proprietor must himself protect it from escape or disclosure. If it cannot be sold or negotiated or used without a disclosure, it would seem proper that some contract should guard or regulate the disclosure, otherwise, it must follow the law of ideas and become the acquisition of whoever receives it. Peabody v. Norfolk, 98 Mass. 452 [96 Am. Dec. 664].

"The allegation of the complaint that the defendant disclosed the system in confidence to the defendant is vague. It does not necessarily mean that the defendant agreed not to use it; it may mean something else. Defendant is at liberty to conduct its business in its own way; it obtained a valuable hint from the plaintiff and assumed no legal obligation to pay the plaintiff if it should conclude to act upon it. * * *

"A. wishes to sell his house and lot. B. tells him in confidence that C. desires to buy it, and B. solicits employment to negotiate the sale. A. declines, but, acting upon B.'s communication, meets C., and himself negotiates and closes the contract of sale. B. has no cause of action against A. He had information which he hoped to market, but he parted with it without finding any market. * * *"

In Stein v. Morris, 120 Va. 390, 91 S. E. 177, the plaintiff claimed to have originated an idea of banking, which by letter and table annexed he communicated and disclosed to the defendant. He alleged that, after his disclosure, which was restricted and confidential, the defendant appropriated his ideas contained in his letter and table annexed, and that he was entitled to recover from the defendant the value of the idea in a suit in equity. At page 394 of 120 Va. (91 S. E. 179), Harrison, P. J., delivering the unanimous opinion of the court, said:

"If, however, appellant had originated the scheme or idea of banking of which he claims to be the owner, he could not have a property right in such a method or idea for conducting business without any physical means or devices for carrying it out. In other words, he could not put such an idea into operation without it at once escaping his own grasp and becoming the property of mankind."

In Hamilton Mfg. Co. v. Tubbs Mfg. Co. (C. C.) 216 F. 401, at page 404:

"Although where an idea, or trade secret or system, cannot be sold or negotiated or used without a disclosure, it would seem proper that some contract should guard or regulate the disclosure, otherwise it must follow the law of ideas and become the acquisition of whoever receives it."

See, also, Haskins v. Ryan, 71 N. J. Eq. 575, 64 A. 436, affirmed 75 N. J. Eq. 623, 73 A. 1118; Universal Sav. Corp. v. Morris Plan (D. C.) 234 F. 382; Soule v. Bon Ami Co., 201 App. Div. 794, 195 N. Y. S. 574, affirmed 235 N. Y. 609, 139 N. E. 754; Masline v. N. Y., N. H. & H. R. R. Co., 95 Conn. 702, 112 A. 639.

■ Practically all of the elements in Mr. Moore's plan and in the "Ford Weekly Purchase Plan" are found in sales plans which had been put into effect by others prior to the time the Ford plan went into effect. The sales plans used at an earlier date by the Radders Motor Company, Francis & Badger Motor Company, and L. G. Peed (Willys-Overland, Inc.) are similar to both Mr. Moore's plan and to the "Ford Weekly Purchase Plan." Even if Mr. Moore's arguments were so convincing that they did lead the Ford Motor Company to adopt an installment plan for the sale of its automobiles and tractors, Mr. Moore cannot recover for that. Moreover, while it is possible that the germ of the "Ford Weekly Purchase Plan" was obtained by the defendant from Mr. Moore's letter, the plaintiff, in my judgment, has not sustained the burden of proof that the defendant did get its idea of the "Ford Weekly Purchase Plan" from Mr. Moore.

■ Plaintiff's motion to exclude defendant's depositions and other proof tending to show lack of novelty and originality in plaintiff's plan are granted to the extent of eliminating such proof from consideration of whether defendant copied plaintiff's literary treatment of the plan, for in this particular aspect of the case, it is immaterial whether the plan itself was novel or original if the defendant copied plaintiff's literary treatment of it. But these depositions, and proof tending to show lack of novelty and originality, have been taken into consideration in other aspects of the case, and as to whether the defendant obtained its ideas from plaintiff or from other sources.

Accordingly the bill is dismissed, but without costs.