Samuel G. HOUSER t/a Houser & Son
v.
SNAP-ON TOOLS CORPORATION, a
Delaware corporation.

Civ. No. 11950.

United States District Court
D. Maryland.

Jan. 23, 1962.

Wm. E. Owen, Washington, D. C., and Melvin M. Feldman, Wheaton, Md., for plaintiff.

Wm. A. Grimes, Ober, Williams, Grimes & Stinson, Baltimore, Md., and Harry C. Alberts, Chicago, Ill., for defendant.

NORTHROP, District Judge.

This action is brought by Samuel G. Houser (herein referred to as "Houser")

against Snap-On Tools Corporation (herein referred to as "Snap-On"). Houser resides in Maryland and owns and operates an automobile repair garage in Washington, D. C. Snap-On, a manufacturer and seller of a line of hand tools, is incorporated under the laws of Delaware, has its principal place of business in Wisconsin, and does business in Maryland.

The complaint seeks to enjoin Snap-On from the further manufacture, sale, or use of a tool alleged to be that of Houser; an accounting and damages are also sought. The complaint alleges the breach of a confidential relation and the unlawful expropriation of the subject matter of a trade secret.

Houser, in July of 1956, developed a nut-spinner, the principal value of which was that it made the threading and unthreading of nuts in both confined and open areas possible, where the mechanical advantage of a lever or "extension" was impractical and unnecessary. In developing this device Houser relied solely upon his own imagination and mechanical skill, except that his son assisted him in making a working model of the device, which was put into use immediately. It was kept in Houser's tool box, together with a wide assortment of other tools, and no particular steps were taken to secrete it from the perception of others. However, it was not displayed to any significant extent. It was treated as just another tool in the possession of a mechanic proud of his craft and the good order of his shop.

In the fall of the same year, 1956, Houser sought to protect himself with regard to the tool in question. No doubt he received pleasure from the successful application of his device, considered it unique, and thought it had some value. Previous to this time Houser had created another device which he had had patented at the cost of about $3,000. In this instance, apparently, Houser was under the impression that he could receive protection comparable to that provided under the patent laws by mailing a registered letter to himself in which were included drawings of the device in question. This he did on December 26, 1956.

On December 31, 1956, Houser wrote eo Snap-On for the first time to the effect that he had perfected a device in which he thought the corporation might be interested. In this letter there was no description of the device, but Houser did state that it was "registered for patent." Despite his own testimony to the contrary, Houser did not fully understand the meaning of this phrase. He saw no difference between sending the *registered* letter and having the device *registered* for patent. Houser did not intend to deceive Snap-On in this regard; he was attempting to show that he had what he believed was some measure of protection for his device.

That Snap-On was misled by Houser's erroneous reference to patent registration is almost certain. It is assumed that, had Houser's letter made no mention of this, the response by Snap-On would have been a letter of rejection. One of Snap-On's vice-presidents testified that the corporation will not consider any disclosures unless the disclosing party indicates that he has patent protection. This policy was in effect at the time of Houser's dealings with Snap-On but there is no evidence that Houser knew of it.

Instead of rejecting Houser's solicitation, Snap-On replied, by a letter of January 4, 1957, stating that it was interested in Houser's device but that the signing of its enclosed Form 230–Rev., set forth in the margin below,[1] would be

---

1. "Copy

              "Date 1/8/57.
"Snap-On Tools Corporation
"Kenosha, Wisconsin
"Gentlemen:
"I wish to submit to you for consideration a certain suggestion which I have conceived relating to   .  .  ..

a new kind of drive

for socket wrenches

"I have been informed by your representatives that you are willing to consider all suggestions which may·be made to you for persons outside of your corporation but that you require. the ac-

required before it would give any consideration to the spinner. This form was signed by Houser, witnessed by his wife, and returned to Snap-On.

Form 230-Rev. is claimed by the defense to be a waiver of any confidential relation and all rights based thereon. As such it is far from being clear and unambiguous. In particular, condition No. 3 does not seem to indicate, as the defense urges it does, that the signing party is waiving all rights other than those based upon the patent laws. Without determining the effect of this so-called waiver, it is doubted that a document such as this would give a manufacturer the right to expropriate a disclosure without remuneration, where the course of dealings between the parties indicates, as it does here, that the disclosing party was seeking remuneration for the use of his creation.[2]

Shortly after Houser returned the form he sent to Snap-On a description of his nut-spinner, making a full disclosure thereof. This disclosure was handled by Gordon R. Anderson, an employee of Snap-On in charge of matters such as this. Anderson testified by deposition that he showed this description to one Ray Knudsen, also an employee of Snap-On working in the New Products De-

partment. Knudsen drew a sketch, referring Anderson to a disclosure made to Snap-On prior to the Houser disclosure by one Manley Clary, in May of 1956. Anderson examined the Clary disclosure in the files of the corporation, surmised that it was markedly similar to the Houser disclosure, and sent a letter of rejection to Houser. This letter is dated February 11, 1957, and states simply that Snap-On has no present interest in manufacturing the device. The letter contains no mention of the prior Clary disclosure; nor does it contain any reference to prior patents of similar devices, Snap-On products of any vintage, or contemporaneous Snap-On research with tools of a similar nature.

This is the full extent of the dealings between Houser and Snap-On prior to the institution of these proceedings.

Subsequent to Houser's disclosure to Snap-On, Houser made similar disclosures to two other tool companies which might be considered competitors of Snap-On. In each instance the Houser tool was rejected by the company to which it was presented, and in neither instance did the company request the signing of a form similar to Snap-On's Form 230-Rev. The defense did not seriously urge, nor do we hold, that these subsequent disclo-

---

ceptance by me of certain conditions before considering my suggestion.

"These conditions are:

"1. Your firm is willing to consider any suggestions which may be made but does so only at the request of the undersigned who has the suggestion.

"2. No obligation of any kind is assumed by, nor may be implied against, your firm unless or until a formal written contract has been entered into and then the obligation shall be only such as is expressed in the formal written contract.

"3. This preliminary disclosure arrangement in no way extends to nor affects the rights provided under the patent laws of the United States except as such may be embodied in a formal written contract between the parties.

"I am agreeable to these conditions and ask you to consider my suggestion under them.

"Yours very truly,
/s/ Samuel G. Houser

"Witness:
"/s/ Katherine E.    "HOUSER & SON
Houser                202 C St., N. W.
                      Washington 1, D. C.
                      Printed in U.S.A."
"Form 230–Rev.

2. See Moore v. Ford Motor Co., 43 F.2d 685 (2nd Cir. 1930), affirming 28 F.2d 529 (S.D.N.Y.1928). The discussion by the Court of Appeals in the Moore case is particularly relevant to condition No. 2 of the document in question here. 43 F.2d 685, at p. 687. Cf. Hisel v. Chrysler Corp., 94 F.Supp. 996 (W.D.Mo.1951), involving a waiver agreement upon which the document in this case was modeled; Boop v. Ford Motor Co., 278 F.2d 197 (7th Cir.1960).

sures and the manner in which the tool was kept in Houser's shop constitute a public dedication of the device.

In the fall of 1957, Snap-On began to market and is marketing at present, a device similar to the Houser device and capable of performing the same functions as the Houser device. Both tools are severable from and attachable to a ratchet wrench lever commonly used in the mechanic's trade. Each device has a broad "washer" arrangement at the base thereof with a square recessed area for engagement with the lever wrench, and the "washer" arrangement in each is sufficiently wide to protrude beyond the base of the lever wrench. This last feature permits the user conveniently to turn the spinner manually by grasping it directly, rather than being limited to the use of the lever extension of the wrench. Both devices are knurled on the "washer" area to facilitate grasping the spinner in the event the hands of the user are greasy; the knurling is different on the two devices, but the difference is one without substance. From the base of both devices there is an extended piece reduced to a square tang for the engagement of the tool which is to embrace the nut. Both devices have a recessed ball bearing in the tang portion to make this last engagement more secure, the bearing being the only part which might be considered moving. The exact proportions of the two devices are not identical, nor are their weights or shapes. The Houser spinner is heavier and squatter. Snap-On's product is "scooped out" between the "washer" and the tang. The metals of which the two devices are made are not the same. The Houser spinner is a crude assemblage of welded scraps, while the Snap-On product is a finely turned, manufactured item. However, none of the differences between the two spinners is material; they both perform the same function in the same manner and with equal efficiency and effectiveness.

A substantial portion of the evidence submitted by the defense relates to a disclosure made to Snap-On by one Howard Ferris, an Arizona mechanic, of an-

other and comparable nut-spinning device. Joseph Johnson, then Snap-On's president, first saw this device at Woudenberg Pontiac in Mesa, Arizona, in 1956. There is some difference in the depositions of Ferris and Johnson as to the exact date, but none as to the year. Upon his return to Snap-On's Wisconsin plant and with the Ferris spinner in his possession Johnson ordered Kermit N. Caves, another employee, to make two production models of the Ferris device. One of these models was sent to Ferris, but Snap-On retained the other.

The evidence relating to the origins of the Snap-On nut-spinner establishes the fact that Snap-On relied almost exclusively upon the Ferris model in its production, with the consent of Ferris. The record is barren of testimony that might indicate that the Snap-On engineers who developed the marketed product were familiar with the Houser disclosure or that they consulted same during its development. Nor is there any evidence that might indicate that either Johnson or Caves had seen the Houser device at this time or that they had consulted with either Anderson or Knudsen about it. Rather, a comparison of the three spinners—those of Houser, Ferris, and Snap-On—demonstrates, even to the untutored eye, a much greater physical similarity between the Ferris and Snap-On devices than between the Houser and Snap-On devices. The only differences between Ferris' spinner and Snap-On's are variations in knurling and slightly varying proportions; and these discrepancies are immaterial.

Nothing in the record, other than the bare facts already related with regard to the Houser disclosure, justifies the conclusion that this device had any connection with Snap-On's production of the nut-spinner challenged here. Counsel for the plaintiff, Houser, has urged vigorously that there is insufficient evidence to warrant this conclusion. He wishes the Court to draw broad inferences from the absence in the evidence of written and dated intra-company reports, memoranda, letters, time cards,

shop data, purchase orders, materials allocations, market and pricing studies, and other such records. Even if it is assumed that such evidence, if it had been presented, would be admissible, we cannot agree with this contention. It is, of course, far more difficult to establish the non-existence or non-occurrence of an alleged fact or event than it is to establish the contrary; positive evidence is more readily adduced than preclusive evidence. Ingenious counsel can always conjure up the unasked question, the unproduced witness, or the absent documentary proof and seek to prevail on the basis of the suspicions which such omissions might arouse. However, in the instant case plaintiff's counsel chose not to avail himself of the elaborate discovery procedure created by the Federal Rules of Civil Procedure, through which he could have determined the existence of many of the documents to the absence of which he now objects. This material was no less relevant to the case of the plaintiff than that of the defendant. In any event, the testimony of at least five witnesses and a comparison of the exhibits satisfactorily and sufficiently establish the fact that Ferris' nut-spinner and not Houser's was the source of the product marketed by Snap-On. The evidence establishing this fact is, in the language of the Hoeltke case "clear, satisfactory, and beyond a reasonable doubt." Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912, 923 (4th Cir. 1935). Ferris' testimony taken by deposition and an examination of the various nut-spinners in question corroborate and confirm the testimony taken of the Snap-On employees in this regard.

Thus, even if it were assumed that there was a confidential disclosure by Houser, the plaintiff nonetheless may not recover. For, where a breach of confidence is alleged, it is a complete defense that the challenged device was produced previous to or independent of the disclosure, and that the information contained in the disclosure was not used in producing the challenged device. Moore v. Ford Motor Co., 28 F.2d 529 (S.D.N.Y. 1928), aff'd 43 F.2d 685 (2nd Cir. 1930); Boop v. Ford Motor Co., 278 F.2d 197 (7th Cir. 1960). The keystone of a trade secret action is a breach of confidence; without proof of confidence reposed in the defendant and without proof of its breach, the action must crumble. E. I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917); Allen-Qualley Co. v. Shellmar Products Co., 31 F.2d 293 (N.D. Ill. 1929), aff'd 36 F.2d 623 (7th Cir. 1929). In the present case, even if there were a confidential relation, the overwhelming weight of the evidence indicates that this confidence was never violated by the defendant. The Houser device was not consulted in the production of the Snap-On nut-spinner.

Snap-On proffered a vast body of evidence with respect to prior disclosures, prior expired patents, abandoned patents, subsequent patents, and prior Snap-On research. Several of these devices would appear to be irrelevant here as their effective dates are after the Houser disclosure.[3] A detailed discussion and comparison of all of these devices and the expert testimony with respect to them would be unduly tedious and unwarranted. However, the Court has considered carefully all of this evidence and is of the opinion that it justifies certain conclusions. First, the principle of the so-called manual or digital nut-spinning device has been common knowledge in the trade for a long time.[4] Second, there are no material differences between the Houser device and a number of these other

3. U. S. Patent No. 2,982,160 dated May 2, 1960, to Robert T. Little and the disclosures in Patent Office Interference No. 89,961, involving the patentee Little, Charles D. Griffith (2151 Chestnut Street, Long Beach, California), and Henry G. Syswerda (3544 South 7th Avenue, Tucson, Arizona).

4. U. S. Patent No. 1,305,249 dated June 3, 1919, to O. H. Buck; U. S. Patent No. 2,462,729 dated February 22, 1949, to E. L. Deck; U. S. Patent No. 2,612,807 dated October 7, 1952, to R. R. Hunt; disclosure of E. L. Deck to Snap-On in 1946; and various Snap-On products marketed as early as the 1930's.

tools.[5] Third, here there is no invention derived from the combination of old elements doing an old job, in a more beneficial and economical way, such as was found in the Hoeltke case, supra.

■ This Court is of the opinion that the device in·question here is not capable of being restricted by virtue of a confidential relation. This conclusion is based upon two grounds suggested by the *Restatement*.[6]

■ First, as has been stated, the Houser device has been known to the trade generally for many years. Neither the device as a whole nor any of its component elements contain any originality.[7] That Houser produced his device independently and without the benefit of this trade knowledge is a matter of no consequence. For the knowledge existed all the same, and it was available to the creative and uncreative alike. American Gage & Mfg. Co. v. Maasdam, 245 F.2d 62 (6th Cir. 1957).

■ Second, there can be no trade secret with respect to a *marketed* device where an examination of the device itself completely discloses the elements of its construction. Speciner v. Reynolds Metal Co., 177 F.Supp. 291 (S.D.N.Y.1959); Mycalex Corp. of America v. Pemco Corp., 64 F.Supp. 420 (D.Md. 1946).[8]

Here there is no information that can be kept secret, as the nut-spinner itself fully reveals its elements and the manner of its construction. The secret is worthless unless the device is marketed; and, once the device is marketed, the secrecy evaporates. The evanescent value of the information never materializes. Although such value might be given substance by the patent and copyright laws, it cannot be coined by hollow confidence.

Much of the testimony in this case was submitted through the . depositions of Ferris, Johnson, Anderson and two other witnesses not mentioned heretofore, George M. Walraven, a Snap-On plant manager, and William A. Seidemann, a retired vice-president of Snap-On. To the admissibility of these depositions counsel for Houser raised several objections on which rulings have been reserved until this time.

■ The first objection is founded on the ground that much of the testimony contained in the depositions was elicited through leading questions. Rule 26(e) of the Federal Civ.Rules, 28 U.S.C.A., provides:

"Subject to the provisions of Rule 32(c), objection may be made at the trial or hearing to receiving in evidence any deposition or part thereof

---

5. U. S. Patent No. 2,462,729 dated February 22, 1949, to E. L. Deck; U. S. Patent No. 2,612,807 dated October 7, 1952, to R. R. Hunt; the disclosure to Snap-On made by E. L. Deck in 1946; and the disclosure to Snap-On made by Manley Clary in 1956.

6. "The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret." Restatement, Torts § 757, comment b (1939).

7. Some of the cases require the subject matter of the trade secret to contain an element of novelty, though this novelty may be less than that necessary to establish patentability. Sandlin v. Johnson, 141 F.2d 660 (8th Cir. 1944). Strictly speaking, this view would appear to be incorrect. Novelty is but one of those

factors which are relevant in determining whether or not the subject of the alleged trade secret *is a matter of public* knowledge or general knowledge within the trade or industry. See Restatement, Torts § 757, comment b (1939).

8. The mere fact that the subject matter of the disclosure is a marketable device, rather than a process or formula, is not alone enough to make the law of trade secrets inapplicable. Where the marketed device is of such complexity that only the plans and not the device itself fully reveal the nature of the device, the plans may be considered as the trade secret and their use may be restricted by a confidential relation. Smith v. Dravo Corp., 203 F.2d 369 (7th Cir. 1953). However, typically the subject matters of trade secrets are processes, formulae, and business information; it is only in exceptional circumstances that the principle just mentioned has been applied.

for any reason which would require the exclusion of the evidence if the witness were then present and testifying."

If this rule were read alone, without reference to Rule 32(c), plaintiff's objection might have some merit. However Rule 32(c) (2) provides:

*"Errors and irregularities occurring at the oral examination* in the manner of taking the deposition, *in the form of the questions* or answers, in the oath or affirmation, or in the conduct of parties and errors of any kind *which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition."* [Emphasis supplied.]

Professor Moore specifically has enumerated the leading question as one of those defects which could be obviated if challenged at the time of the taking of the deposition:

Objections based on grounds which might have been obviated or removed if presented at the deposition examination, *as that the questions are leading,* are waived, however, unless the objections were made at that time. [emphasis supplied] 4 Moore, Federal Practice ¶26.34, at p. 1202 (2nd ed. 1950), citing Thompson v. Thompson [82 U.S.App.D.C. 325], 164 F.2d 705 (1947).

Counsel urged that this rule of law should not be applied here, as the depositions were many and taken far away from the present forum; he urged that his client has but limited funds and could not afford to send counsel so far so often. This contention has little merit, as plaintiff could have obtained local counsel to protect his interests at the taking of the various depositions; also, he might have applied for an order for the protection of parties under Rule 30(b). Counsel had notice of the taking of the depositions and could have taken steps to protect his client. He did not do so and must suffer

the consequences he readily might have anticipated. The fact that an objecting party elected not to be represented at the taking of the deposition—as the case is here—does not render Rule 32(c) (2) inapplicable. Batelli v. Kagan & Gaines Co., 236 F.2d 167 (9th Cir. 1956).

Houser's second objection is founded upon Rule 30(f) (3) which provides:

"The party taking the deposition shall give prompt notice of its filing to all other parties." [9]

This Rule must be read in conjunction with Rule 32(d):

"Errors and irregularities in the manner in which testimony is transcribed or the deposition is prepared, signed, certified, sealed, indorsed, transmitted, filed, or otherwise dealt with by the officer under Rules 30 and 31 are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained."

As a practical matter, the failure of Snap-On to notify Houser of the filing of the depositions had no detrimental effects. Counsel for the plaintiff freely admitted that, in fact, he saw the depositions prior to trial; they were in the Clerk's file for all to see. Thus, Rule 61, dealing with harmless error is relevant. This Rule requires the Court to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

The error complained of in no way affects the value of the depositions as evidence. So, even if it cannot be said that there has been a waiver of the right to object—and it very well might—defendant's slight oversight does not justify so drastic an action on the part of the Court.

Houser's third objection alleges that the defendant has failed to justify the admissibility of the depositions as

---

9. To the same effect as Rule 31(c).

required by Rule 26(d). Those parts of this Rule which appear to be relevant here are as follows:

"At the trial * * * any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one of the following provisions

* * * * * *

"(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: * * * 2, that the witness is at a greater distance than 100 miles from the place of trial or hearing, * * * unless it appears that the absence of the witness was procured by the party offering the deposition; or 3, that the witness is unable to attend or testify because of age, sickness, infirmity, or imprisonment * * *."

With regard to the Anderson deposition, it has not been disputed that the deponent, at the time of trial, was in the hospital. This clearly falls within the terms of provision (3)3.

All of the other deponents—Johnson, Ferris, Walraven, and Seidemann—were at a distance substantially greater than 100 miles from Baltimore at the time of trial. For the purposes of Rule 26(d) (3)2 the mere absence of the deponent from the 100 mile area is sufficient, and the party attempting to submit the deposition into evidence need not proffer an excuse for the failure of the deponent to appear in court.

"In view of the clear intent and purpose of the rule there would be no particular reason or sense in substituting a purely arbitrary restriction for the discretionary finding as to the purpose of the absence, required by the rule itself as a condition of exclusion." Judge Clark, dissenting in Arnstein v. Porter, 154 F.2d 464, at p. 478, n. 4 (2nd Cir. 1949).

In part, Houser's objection is based upon the "unless" clause of provision (3)2; that is, Houser alleges "that the absence of the witness was procured by the party offering the deposition." However, procuring absence and doing nothing to facilitate presence are quite different things, and here we have no showing or allegation that Snap-On actively took steps to keep the deponents from setting foot in the courtroom. See Weiss v. Weiner, 10 F.R.D. 387 (D.Md. 1950). It is doubtful that the Federal Rules require a party to subpoena a deponent to testify at trial; and, as a matter of tactics, it is understandable that the defendant did not do so here. As the defendant certainly perceived, the failure to subpoena these deponents deprived the plaintiff of the opportunity to cross-examine; but, this opportunity was lost by the plaintiff himself.

A corporate party may take the depositions of its officers as witnesses, and use these at trial. Although this proposition is less certain where the deposing officers are deemed to be the party itself, such is not the situation here. It cannot be said that a plant manager (Walraven), a retired president (Johnson), or a retired vice-president (Seidemann) are the corporation. None of these men were named as parties defendant in the complaint, though this is not necessarily conclusive. See 4 Moore, Federal Practice, ¶26.30, at pp. 1195–1197 (2nd ed. 1950).

The final objection is based upon Rule 32(c) (1) and is raised only in connection with the Anderson deposition. The Rule reads as follows:

"Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time."

This Rule is to be read in conjunction with Rule 26(e), referred to previously.

Counsel has questioned Anderson's competency, but he has failed to adduce any positive, extrinsic evidence that would justify such a conclusion. He merely suggested that Anderson's presence in the hospital permits the inference that he was under the influence of debilitating drugs when he was examined. Assuming that the objection was raised in a timely manner, a careful reading of the challenged deposition gives no reason to doubt the competency of the deponent, nor does it suggest that his testimony should be impeached. To exclude this deposition on the basis of unsubstantiated suspicion would serve no useful purpose in the administration of justice, just as it would serve no justifiable end to prohibit the examination of a sixteen year old. Union Central Life Ins. Co. v. Burger, 27 F.Supp. 556 (S.D.N.Y.1939).

In accepting into evidence all of the depositions with regard to which objections have been raised, the Court has taken into account all apparent defects and has given each deposition the weight which, in the Court's opinion, it merits. The Court has been cognizant, in particular, of the lack of cross-examination and the interests of the deponent in each instance.

For the aforegoing reasons judgment shall be entered in favor of the defendant, Snap-On, each party to bear its own costs.