Samuel L. Pidot and Chauncey E. Waltman, Appellants, v. Zenith Radio Corporation, Appellee.

Gen. No. 41,274.

Opinion filed January 22, 1941.   Rehearing denied February 5, 1941.

HIRSCH E. SOBLE and ABRAHAM W. BRUSSELL, both of Chicago, for appellants.

MONTGOMERY, HART, PRITCHARD & HERRIOTT, of Chicago, for appellee; IRVING HERRIOTT and W. WARD SMITH, of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

On December 22, 1936, plaintiffs filed their complaint in the circuit court of Cook county and charged the defendant with breaching and violating a ''confidence'' by wrongfully appropriating original radio cabinet designs prepared by the plaintiffs at the request of

defendant and in using the designs in the line of radio sets sold by the defendant, and praying for an accounting, for an injunction restraining the manufacture and sale of the design so wrongfully appropriated, and for an injunction requiring defendant to assign certain patents to the plaintiffs. Upon order of court plaintiffs filed a bill of particulars, which confines the charges of the complaint to the single design attached to the complaint as Exhibit A. (Received in evidence as plaintiffs' exhibit 2.) The bill of particulars states that Exhibit A ''illustrates a novel design created by plaintiffs . . . ; that plaintiffs during the month of November, 1935, disclosed to defendant how the basic features of the design illustrated in plaintiffs' Exhibit A could be applied to and embodied in radio cabinets; that the design as a whole as illustrated in plaintiffs' Exhibit A . . . has been wrongfully appropriated by defendant in each of the models of defendant's radio cabinets, . . . ; that defendant's radio cabinets, as illustrated in defendant's catalogue and designated specifically in paragraph 10 of the complaint, embody either an exact or an approximate simulation of plaintiffs' design as shown in said plaintiffs' Exhibit A of the combination of rounded corners on the cabinets and rounded edges both at the vertical junctures of the side walls of the cabinets and at the horizontal junctures of the side walls with the top walls of the cabinets, together with a plurality of horizontally extended louvres.'' Defendant answered and denied that it appropriated plaintiffs' design, and on the contrary alleged that the designs of its radio cabinets allegedly embodying plaintiffs' design were conceived and developed independently thereof. Defendant also denied that plaintiffs' design, in so far as it merely combined the particular features set forth in plaintiffs' bill of particulars, was new or novel. The cause was referred to a master in chancery who found the issues in favor of the defendant and recommended that the complaint

be dismissed for want of equity. Objections to the report were overruled. These objections were ordered to stand as exceptions. The chancellor overruled the exceptions and entered a decree which approved the findings and conclusions of the master and dismissed the complaint for want of equity at plaintiffs' costs. Plaintiffs prosecute this appeal from the decree and ask for a reversal and for the entry of a decree in their favor.

Plaintiffs' theories are: First: As a matter of law based on the undisputed evidence on equitable principles governing relations of trust and confidence the defendant is obligated to account to the plaintiffs to prevent unjust enrichment of the defendant at the plaintiffs' expense by means of a wrongful appropriation by the defendant of a novel and original design of radio cabinet as shown in the record as plaintiffs' exhibit 2. Second: Considering all the evidence in the record, the clear and manifest weight of the evidence shows that the defendant is obligated to account to the plaintiffs on equitable principles governing relations of trust and confidence to prevent unjust enrichment of the defendant at the plaintiffs' expense by means of a wrongful appropriation by the defendant of a novel and original design of radio cabinet as shown in the record as plaintiffs' exhibit 2. Third: That the plaintiffs' design of radio cabinets as shown by plaintiffs' exhibit 2 was novel and original. Fourth: That the defendant by taking out patents on its infringement of plaintiffs' design is precluded or estopped· from claiming that it is not liable for its wrongful appropriation of plaintiffs' design on the ground that it is not novel or original. Fifth: That the defendant's wrongful appropriation of plaintiffs' novel and original design was an infringement of the design of plaintiffs' exhibit 2. Sixth: That equity will prevent the defendant from taking advantage of the confidential relationship between defendant and

plaintiffs and will not suffer the plaintiffs to be wronged by the defendant without giving plaintiffs a remedy therefor. Seventh: That the plaintiffs are entitled to the specific equitable relief of an accounting and injunction requiring the defendant to convey certain patents to plaintiffs and an injunction restraining it from manufacturing any models based upon misappropriation of plaintiffs' novel and original design. On the other hand, the defendant contends that "the findings of fact of the Master in Chancery having been approved by the Chancellor, this court should not disturb such findings unless they are manifestly against the weight of the evidence; . . . that it did not appropriate plaintiffs' design for a radio cabinet, but on the contrary the designs of defendant's radio cabinets were developed by certain of its employees in simulation of the hood of the Cord automobile independently of plaintiffs' design and prior to the submission of that design to the defendant; that the features of plaintiffs' design relied upon by them were not new and original and that neither the plaintiffs nor anyone else can obtain a monopoly of the right to use those features as distinguished from the manner or form in which the same are used in combination; that plaintiffs' design is not so similar to the designs of defendant's 'Zephyr' line of radio cabinets as to amount to or tend to establish any appropriation by defendant of plaintiffs' design, and that to the extent that there are any features in common in the broad sense between plaintiffs' and defendant's designs that the same arise from the common source of inspiration, namely, the hood of the Cord automobile; that if any accounting should be directed the basis of such accounting should not be that plaintiffs are entitled to that part of defendant's profits arising from the sale of its 'Zephyr' line of radios which the cost of the cabinet in which the radios are housed bears to the cost of the complete radio set, but

that any such accounting should be limited to the usual and customary basis upon which designers of radio cabinets are paid, which the evidence shows is one half of one per cent of the cost of the cabinet, or in any event should be governed by the rule laid down in one of the cases most strongly relied upon by plaintiffs, i.e., *Booth v. Stutz Motor Car Co.*, C. C. A. 7th, 1932, 56 F. 2d 962, that such accounting should be limited to that part of the profits from the sales of the 'Zephyr' line of radios which may fairly be attributed to the use by defendant of the features of plaintiffs' design which were not common property.''

The master found that plaintiffs in the spring of 1935 organized a partnership under the name of Pidot & Waltman to engage in the business of interior designing and industrial styling, including the creation of designs for industrial production. Plaintiffs carried on their business at 549 North Michigan avenue, Chicago. The plaintiff, Samuel L. Pidot, in 1935, at the time of the organization of Pidot & Waltman, was primarily an interior decorator. He had done some industrial designing work to a minor extent, and did not begin designing furniture as a regular occupation until 1935, although in previous years he had styled furniture for clients in his interior decorating business. Waltman had designed furniture commercially prior to the formation of the partnership of Pidot & Waltman, but had only a limited success in the sale of designs for radio cabinets, having placed only a few of such designs on the market prior to the organization of such partnership. From the date of its organization in the spring of 1935 until October, 1935, the partnership of Pidot & Waltman made designs of radio cabinets for the trade but were not successful in selling any of the designs created by them; that in October, 1935, Mark Piper, a salesman of Pidot & Waltman, accompanied by Pidot, called at the offices of defendant in Chicago, which was then and is now

engaged in the business of manufacturing and selling radio receiving apparatus; that the purpose of the call was to interest defendant in certain designs for radio cabinets which had been prepared in the offices of plaintiffs; that Piper and Pidot exhibited sketches, which had been prepared in plaintiffs' offices, to Eugene A. Tracey, vice president and sales manager, and A. W. Freese, works manager of the defendant; that the latter after examining the sketches so exhibited, stated that they were not interested in the sketches submitted; that Pidot requested an opportunity to submit additional sketches, to which Tracey and Freese acceded; that in the last week of November, 1935, Pidot, this time accompanied by his partner Waltman, again called at the offices of defendant in Chicago and submitted additional sketches to Tracey and Freese, who displayed an interest in two of the sketches which were received in evidence as plaintiffs' exhibits 2 and 3; that the instant suit involves the design embodied in plaintiffs' exhibit 2, which plaintiffs assert defendant appropriated and used in its Zephyr line of radios. Waltman was inspired to design exhibit 2 when he viewed the hood of the new 1936 Cord automobile at the automobile show in Chicago in November, 1935. At this second conference there was a discussion as to the making of a sample cabinet embodying the design set forth in plaintiffs' exhibit 2, and it was decided that plaintiffs should discuss the making of such a sample cabinet with the Winnebago Manufacturing Company, which was then and is now engaged in the manufacture of radio cabinets and which was one of the companies manufacturing radio cabinets for sale to defendant; that at the conclusion of the second conference and in the last week of November, 1935, plaintiffs departed with all of their sketches, including plaintiffs' exhibit 2, and within the next few days caused a blueprint to be prepared embodying the design sketched in plain-

tiffs' exhibit 2; that in the early part of December, 1935, plaintiffs conferred with various employees and officials of the Winnebago Manufacturing Company at its offices in Chicago in regard to the manufacture of a sample cabinet embodying plaintiffs' design set forth in their exhibit 2, and at this conference exhibited to the officials and employees of the Winnebago Manufacturing Company the sketch of their design and the blueprint embodying the same; that the officials and employees of the Winnebago Manufacturing Company then stated that the cost of producing in substantial quantities cabinets based upon plaintiffs' design would be approximately $25 a cabinet, and that since the defendant desired cabinets of this type to be produced at a cost not to exceed $8 to $10, the Winnebago Manufacturing Company did not feel that it was practical, nor would they be interested in manufacturing cabinets based on plaintiffs' design; nor would they consent to the manufacture of a sample cabinet unless they received assurances from the plaintiffs or the defendant that they would be paid the sum of $250 for the production of a sample cabinet; that it was thereupon agreed between the plaintiffs and the Winnebago Company that the sketches and blueprints embodying plaintiffs' design would be left with the Winnebago Company, which would communicate with the defendant in regard thereto; that a few days thereafter the Winnebago Company communicated with Freese and Tracey and advised them as to these facts; that Freese and Tracey thereupon concluded that they would not be interested in expending the sum necessary for the sample cabinet based upon plaintiffs' design, nor would they be interested in having such cabinets manufactured for the defendant at a cost of $25 per cabinet and so advised the Winnebago Company, which thereupon delivered to Freese the sketches and blueprints which had been left with the Winnebago Company by the plaintiffs, and that on or about De-

cember 19, 1935, these sketches and blueprints were returned by Freese to plaintiffs through the mails, with a letter from Freese in which he stated that the defendant was not interested in the use of the plaintiffs' design. Pidot and Waltman testified that at the conference between plaintiffs and Tracey and Freese in the last week of November, 1935, plaintiffs stated that if the designs submitted, or any of them, were used by the defendant, plaintiffs would expect to be compensated therefor and that Tracey replied that this was satisfactory, and that if the design embodied in plaintiffs' exhibit 2 was used by defendant in its line, plaintiffs could anticipate the receipt of a large royalty payment, in view of the fact that this design would be embodied in the popular priced numbers of the defendant's line. Tracey and Freese, however, denied making this statement and testified that at the time of the first conference with Pidot and Piper in October, 1935, Tracey specifically stated that the compensation to the plaintiffs for such of their designs as might be accepted by defendant would be on the basis of 1 per cent of the cost of the cabinet incorporating the design, which amount would be paid by the manufacturer of the cabinets from whom the defendants purchased the cabinets which might be based on the design, this being the general practice of the defendant in regard to compensating designers whose designs were accepted and incorporated in cabinets manufactured for and used by the defendant in the production and sale of its radios. The evidence shows that since the year 1933, the defendant has not manufactured radio cabinets in its own plant, with the exception of samples and models, but has purchased cabinets from various manufacturers of cabinets who manufacture and sell cabinets to the defendant in accordance with designs and specifications approved by defendant. The master further found that the testimony of Tracey and Freese in regard to the matter

of the payment to the plaintiffs in the event their design was accepted, was of "greater credence" than the testimony of plaintiffs on that point, and that the plaintiffs were advised at the time of the submission of the design in question to defendant, that in the event plaintiffs' design was accepted plaintiffs would have to look for their compensation to the cabinet manufacturer who would be selected to manufacture cabinets incorporating such design, and that the compensation of plaintiffs would be equivalent to 1 per cent of the cost of the cabinet. The master also found that in the summer of 1936 defendant sold radios assembled in radio cabinets manufactured for it by the Steger Manufacturing Company, which cabinets the plaintiffs contend embodied the plaintiffs' design as set forth in exhibit 2 and the other exhibits received in evidence. The master pointed out that the plaintiffs argued before him, as they do here, that the resemblance between the plaintiffs' design and the cabinets manufactured by the defendant known as the Zephyr line can only be explained by the fact that the defendant surreptitiously appropriated plaintiffs' design notwithstanding that the defendant had returned plaintiffs' design to them with the statement that the defendant was not interested in using such design. The master found that the testimony in behalf of the defendant was to the effect that the design embodied in the Zephyr line of cabinets sold by the defendant in the summer of 1936 and thereafter, which plaintiffs contend incorporated their design, was created by its president, Eugene F. McDonald, Jr., and its assistant factory supervisor, John Stevens, and that the evidence in support of such contention is that Eugene F. McDonald, Jr., testified that in the fall of 1935, he was giving serious consideration to the production of an armchair or end table model radio to be included in defendant's line; that such model had been attempted previously

without success, but that he was convinced this was the logical type of cabinet for radios; that he instructed the officials of his factory to design such armchair or end table model and that four or five designs had been submitted to him which were all unsatisfactory; that in November, 1935, he visited the automobile show in Chicago, saw the Cord automobile and came to the conclusion that the design of the radiator hood thereof would be an appealing design for an armchair radio cabinet; that he spoke with Mr. Cord and Mr. Manning, officials of the company manufacturing the Cord automobile, and requested their permission to incorporate this design in a radio cabinet, and that he was given permission so to do by Cord to whom he promised the first model embodying the Cord design which might be manufactured and sold by defendant; that shortly afterward in the latter part of 1935, he communicated by telephone with his assistant factory manager, John Stevens, and instructed him to build a sample armchair radio cabinet embodying the design of the Cord radiator hood; that Stevens, with the assistance of Robert M. Hall and Axel Lundstrom, employees of defendant, built a sample armchair model radio embodying the design, which model was received in evidence as defendant's exhibit 18. McDonald further testified that he inspected exhibit 18 after it was constructed and suggested certain changes which Lundstrom and his assistants put into effect in building a subsequent armchair model, a replica of which was received in evidence as plaintiffs' exhibit 19; that he further instructed that sample table and console models be built embodying the same design as exhibits 18 and 19; that these models were built by Stevens and his assistants and that he (McDonald) finally approved all of these models for inclusion in defendant's line. McDonald further testified that during all this time he had no knowledge or notice

of plaintiffs' design; that the design of the defendant was based on the design of the Cord automobile and that the application of the design incorporating the Cord automobile to a radio cabinet was effected by Stevens and his assistants on the instructions of McDonald. The master found that the material portion of McDonald's testimony is corroborated by the witnesses Stevens, Hall and Lundstrom; that these witnesses, in substance, testified that, acting under instructions from McDonald, they built defendant's exhibit 18, which is an armchair model of radio cabinet, and that they incorporated the design of the radiator hood of the Cord automobile in this cabinet; that certain changes were thereupon suggested in the cabinet by McDonald, and that they thereupon built an armchair model incorporating these revisions, and that thereafter, at McDonald's instruction, they likewise built table and console models of radio cabinets incorporating the design of the radiator hood of the Cord automobile; that plaintiffs' exhibit 9 was a replica of one of the console models so constructed. Defendant's witnesses testified that during the time of the building of the models they had no knowledge or notice of plaintiffs' exhibit 2, and that the models built by them incorporated the design of the Cord automobile in all material respects. Lundstrom testified that under Stevens's supervision and with the assistance of Hall, he personally built the first armchair model (defendant's exhibit 18) incorporating the design of the Cord radiator hood, commencing a few days before Thanksgiving 1935, and that he completed the model on the afternoon of the day before Thanksgiving, which was November 27, 1935; that he remembered this day because it was the day preceding his marriage and that he was anxious to complete this specific work so it would not be necessary to work on his wedding day; that he was desirous of

completing the job because the request for the cabinet had come from the president of the company who rarely made such requests. Stevens, Hall and Lundstrom also testified that the model of defendant's exhibit 19 was built approximately two weeks after model exhibit 18, and that the table and console sample models embodying the same design were built by them approximately six or eight weeks later. Continuing, the master found that the cabinets in defendant's line incorporating the design of the Cord automobile were manufactured for the defendant by the Steger Manufacturing Company, and the cost of the armchair model (defendant's exhibit 19) was $9.98, and the cost of the console model (defendant's exhibit 9) was $8.53, less certain discounts, and that a few of the first production models of these radios were delivered to Mr. Cord in accordance with McDonald's promise; that on April 16, 1936, Stevens filed application in the United States Patent Office for a design patent on the several models of radio cabinets incorporating the design of the Cord automobile, and that on June 23, 1936, letters patent for the design of the armchair model, table model and console model were issued to Stevens and assigned by him to defendant, which letters patent were received in evidence as plaintiffs' exhibits 15, 16 and 17. The master after observing the demeanor of the witnesses and after evaluating all of the evidence, came to the conclusion that the testimony of the witnesses, McDonald, Stevens, Hall and Lundstrom, to the effect that the design for the defendant's radio cabinets in question was based exclusively upon the design of the Cord automobile hood and independently applied by defendant to radio cabinets, is entitled to credence, and that the material testimony of these witnesses is true; that the coincidence in the submission of plaintiffs' design to the defendant and the independent origin by the president of

defendant company and some of his employees, of defendant's design can be explained and is explained by the fact that the showing of the Cord automobile at or about the time in question proved to be a common source of inspiration not only to the plaintiffs and the defendant, but also to another person who was a witness, namely, Jan Streng, who at the time he was so inspired, was approximately 900 miles away from either the plaintiffs or the defendant. Streng testified that prior to November 16, 1935, he saw the Cord automobile in New York City and made a sketch applying the design of the hood of the Cord automobile to a radio cabinet, which sketch he submitted to several distributors and radio manufacturers, and which sketch was received in evidence as defendant's exhibit 16. Streng's design (defendant's exhibit 16) is a sketch of a table model radio based on the Cord automobile and containing horizontal extending louvers and rounded edges and corners. The master found that an examination of this sketch and a comparison of it with the other exhibits in the record reveals that Streng's design more closely resembles the hood of the Cord automobile than either the plaintiffs' or the defendant's design, and that the order of resemblance to the Cord automobile of the three designs is: First: Streng's design. Second: Defendant's design, and Third: Plaintiffs' design. The master stated that plaintiffs argue that it was incredible to believe that McDonald, Stevens, Hall and Lundstrom would not have been advised by Freese and Tracey of the submission by the plaintiffs of their design and that it is likewise incredible to believe that Stevens and his assistants would build a sample model of a cabinet as they did in the construction of defendant's exhibit 18, without Freese and Tracey knowing that the cabinet was being constructed at the time of its construction. The master found that McDonald, Lundstrom, Hall and

Stevens had no knowledge of the existence of plaintiffs' design, and that Freese and Tracey were not advised and did not know of the construction by Stevens and his assistants of defendant's exhibit 18 until after it was completed; that he came to this conclusion not only because he was satisfied after observing the demeanor of the witnesses that the testimony of Freese, Tracey, McDonald, Stevens, Lundstrom and Hall on this point is entitled to credence, but also because in an organization as large as that of the defendant it is understandable that certain work might be going on without all of the officials having knowledge thereof during its progress. The master also found that the special features of plaintiffs' design, as stated in the bill of particulars, are the combination of rounded corners on the cabinet and rounded edges both at the vertical junctures of the side walls of the cabinet and the horizontal junctures of the side walls with the top walls of the cabinet, together with a plurality of horizontally extending louvers; that the design of the defendant which plaintiffs contend is substantially similar to plaintiffs' design is embodied in plaintiffs' exhibit 9, which is a console model of radio cabinet sold by defendant; defendant's exhibit 12, which is a photograph of one of defendant's armchair models; defendant's exhibit 13, which is a photograph of one of defendant's table models; defendant's exhibits 14 and 15 which are photographs of certain of defendant's console models, and defendant's exhibit 19 which is one of the armchair models of radio cabinets of the defendant; that there are several points of difference between plaintiffs' design and defendant's design which are evident from an examination of the respective exhibits above enumerated; that the first point of difference is that in plaintiffs' design the contour of the louvers is concave, whereas in the design of the defendant, the contour of the louvers is

convex; that the second point of difference is that in plaintiffs' design the louvers do not project from the main mass of the cabinet, but are set under the cabinet, whereas in the defendant's design, the louvers project from the main mass of the cabinet; that the third point of difference is that in plaintiffs' design the louvers conceal the grill cloth or wood construction in back of the louvers, whereas in defendant's design the louvers do not conceal the grill cloth or wood construction that is in back of the louvers; that the fourth point of difference is that the rounding of the corners in the defendant's design is more in character with the automobile radiator hood of the Cord automobile, from which the designs of both the plaintiffs and the defendant were adapted, than is the case of plaintiffs' design. The master concluded that while there is similarity between plaintiffs' design and defendant's design, there are these substantial differences in the two designs. The master, continuing, stated that the complaint alleges that the design of the plaintiffs is a novel and original design, and found that the originality or novelty of their design is an essential element of the plaintiffs' case; that it is undisputed that the plaintiffs conceived the design which is involved from the radiator hood of of the Cord automobile; that the special features of plaintiffs' design, namely, the combination of rounded corners on the cabinet and rounded edges both at the vertical junctures of the side walls of the cabinet and the horizontal junctures of the side walls with the top walls of the cabinet, together with a plurality of horizontally extending louvers, are embodied in the radiator hood of the Cord automobile. As to plaintiffs' contention that the application of these features was original and novel, the master found that rounded edges and corners were used in the manufacture of furniture and radio cabinets prior to the submission by the plaintiffs of their design to the defendant;

that there is credible evidence in the record that horizontal bars in the nature of louvers were used in radio cabinets and furniture prior to the submission of plaintiffs' design to the defendant, and that a radio cabinet combining rounded corners and edges with bars resembling louvers was manufactured by the Sparks-Withington Manufacturing Company (which manufactured the Spartan Radio) prior to the creation of plaintiffs' design and its submission to the defendant. Photographs of the Spartan Radio combining rounded corners and edges with bars resembling louvers were introduced in evidence as defendant's exhibits 9, 10 and 11. The master concluded that plaintiffs' design was not a novel and original design; that it was based on the radiator hood of the Cord automobile; that rounded edges and rounded corners had been used in radio cabinets and furniture prior to the creation of plaintiffs' design; that horizontal bars resembling louvers had been used in furniture and radio cabinets prior to the creation of plaintiffs' design and that radio cabinets had been produced prior to the creation of plaintiffs' design incorporating the features of rounded edges and corners with bars resembling louvers, and that the allegation in the plaintiffs' complaint that they conceived a new and original design is not sustained by the evidence. Hence, the master found that the defendant did not appropriate plaintiffs' design, but that the design used by defendant in the radio cabinets in question was based upon the Cord automobile hood, and that the application of the design of the Cord automobile hood to defendant's radio cabinets was independently conceived by Eugene McDonald, Jr., president of defendant company, and was executed by employees acting under instructions from him; that there are substantial differences in the design submitted by the plaintiffs and the design incorporated into the defendant's cabinets, and that the design used

by defendant more closely resembles the design of the Cord automobile hood than it resembles the plaintiffs' design, and that plaintiffs' design, in fact, was not a novel or original design.

Defendant concedes that one who wrongfully appropriates a new and novel design or invention disclosed in confidence by another for the purpose of sale must answer to that other in damages and for profits realized therefrom, and that this principle is a necessary requirement of fair dealing and commercial integrity. Defendant insists, however, that in order to recover under this recognized rule plaintiffs must establish (1) an adequate disclosure; (2) a new and novel design; (3) a disclosure in confidence, and (4) the appropriation of the design so disclosed in confidence. Defendant asserts that the burden is on the plaintiffs to establish by a preponderance of the evidence each of these four conditions of recovery. Plaintiffs, on the other hand, maintain that the disclosure by them to Tracey and Freese of their ideas concerning an original radio cabinet design was made on the basis of a confidential or fiduciary relationship; that equity will protect plaintiffs and prevent defendant from unconscionably profiting by applying the information gained in confidence. Plaintiffs also urge that since the disclosure to Tracey and Freese was undisputed, if the defendant relied on the defense that McDonald and Stevens had anticipated plaintiffs' design by independent and separate conception and invention, the burden of proof was on defendant to show such independent anticipation beyond a reasonable doubt. Plaintiffs assert that the undisputed evidence establishes that the defendant failed to sustain its burden of proof of showing anticipation beyond a reasonable doubt. Plaintiffs further argue that the clear and manifest weight of the evidence establishes that Freese, McDonald and Tracey did wrongfully appropriate plaintiffs' ideas for the benefit of defend-

ant.  We have carefully read and viewed the testimony and the exhibits, the arguments presented and the numerous cases cited.  Plaintiffs charge the defendant, through its officers and employees, with unlawfully appropriating to its own use a new and novel design. This is a polite way of saying that these officers and employees conspired to steal the design.  If the defendant did steal the design, plaintiffs are entitled to recover whatever damages they suffered.  On the other hand, if the defendant did not steal the design the plaintiff cannot recover.  If the defendant breached the confidence reposed in it by plaintiffs, a court of equity will give relief.  The defendant, if guilty, will not be permitted to hide behind any disguise in order to defeat the plaintiffs in their just claims.  We agree with the contention of plaintiffs that the basis of recovery is breach of confidence and that it is not necessary for plaintiffs to establish that their design was new and novel as to the entire world.  We also agree with the contention of plaintiffs that when they disclosed their design to the defendant a confidential relationship arose.  It is apparent that in so far as the parties were concerned, plaintiffs' design was new and novel.  In fact, Mr. McDonald, in directing his subordinates to construct a model radio cabinet based on the hood of the Cord automobile, recognized that he (McDonald) had conceived a new and novel design for radio cabinets.  Having viewed the radio cabinets in evidence and compared them with plaintiffs' drawing (plaintiffs' exhibit 2) we are of the opinion that there is a marked resemblance between plaintiffs' drawing and the cabinets.  Plaintiffs argue that the master committed a fundamental error in his approach to the problem presented in that he failed to recognize that a fiduciary or confidential relationship existed.  We hold that a confidential relationship did exist and in that respect, disagree with the findings of the master.  Plaintiffs then argue that the burden

of proof is on the defendant to prove its defense of anticipation beyond a reasonable doubt. Plaintiffs cite cases in support of the doctrine that courts of equity will scrutinize with the most jealous vigilance transactions between parties occupying fiduciary relations toward each other, and that the burden of proof is on the fiduciary in such a case to establish the fairness of the transaction. We agree that the burden of proof to show that the radio cabinets in dispute were independently the design of the defendant without being influenced by the plaintiffs' design, is on the defendant. However, we are of the opinion that under the circumstances of this case it is only necessary for the defendant to establish its good faith by a preponderance of the evidence. As a matter of practical application in a case of this kind, however, there is little difference between proving its defense of independent and separate conception of the design by a preponderance of the evidence, or beyond a reasonable doubt. Under either rule it would be a question of credibility. The defendant's witnesses told the truth or they did not tell the truth. The record satisfies us beyond a reasonable doubt that the defendant acted in good faith. We find that McDonald independently conceived the idea of the cabinets in dispute after having viewed the hood of the Cord automobile, and that he, without disclosing his idea to Tracey and Freese, caused the model cabinet to be constructed by Stevens with the assistance of Hall and Lundstrom. We are convinced that the officers and employees of the defendant did not conspire to wrongfully appropriate the design of the plaintiffs. We find that McDonald, without knowledge of plaintiffs' design and without knowledge that plaintiffs had conceived such a design, independently conceived the design which plaintiffs now contend defendant unlawfully appropriated. The master saw and heard the witnesses. It was his province in the first instance to determine

the facts. While the master's findings of fact do not carry the same weight as the verdict of a jury, nor of a chancellor where the witnesses have testified before him, yet such findings are entitled to due weight on review of the cause. (*Pasdach v. Auw,* 364 Ill. 491, 496; *Brainard v. Brainard,* 373 Ill. 459, 461.) The master's findings, except where we have indicated a contrary view, are amply supported by the record. We are convinced that the action of the chancellor, in dismissing the complaint for want of equity, was proper and in accordance with equitable principles. Therefore, the decree of the circuit court of Cook county should be and it is affirmed.

*Decree affirmed.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.