**SMITH v. DRAVO CORP.**

No. 10683.

United States Court of Appeals
Seventh Circuit.

April 10, 1953.

Rehearing Denied May 11, 1953.

Wilfred S. Stone, Becher W. Hungerford, Chicago, Ill., for appellant.

Charles B. Spangenberg, Chicago, Ill., William H. Parmelee, William G. Young, John S. Mason, Christy, Parmelee & Strickland, Pittsburgh, Pa., for appellee.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiffs appeal from a judgment for defendant entered at the close of a trial by

the court without a jury. The complaint is in four counts: 1 and 2 charge an unlawful appropriation by defendant of plaintiffs' trade secrets relating to the design and construction and selling and leasing of freight containers; 3 and 4 aver infringement of plaintiffs' patents Nos. 2,457,841 and 2,457,842. Under count 1 plaintiffs seek: (a) to enjoin defendant from (1) competing with plaintiffs in the freight container business until such time as plaintiffs shall have reestablished their container in the trade and (2) manufacturing any such container embodying the features of plaintiffs' design; (b) the surrender and destruction of defendant's containers and drawings and tools especially designed for the manufacture of the containers; (c) the assignment of all patents obtained by defendant on freight containers, container ships and lifting rigs; (d) an accounting of and payment to plaintiffs of the profits realized by defendant, together with threefold the amount of damages suffered by plaintiffs, as a result of the alleged unlawful appropriation of plaintiffs' trade secrets; (e) reasonable attorney's fees. Count 2 seeks recovery in the sum of $1,000,000 on a theory of unjust enrichment, while counts 3 and 4 demand the customary patent infringement relief of damages and injunction. We concern ourselves first with counts 1 and 2.

In the early 1940s Leathem D. Smith, now deceased, began toying with an idea which, he believed, would greatly facilitate the ship and shore handling and transportation of cargoes. As he was primarily engaged in the shipbuilding business, it was quite natural that his thinking was chiefly concerned with water transportation and dock handling. Nevertheless his overall plan encompassed rail shipping as well. He envisioned construction of ships especially designed to carry their cargo in uniformly sized steel freight containers. These devices (which, it appears, were the crux of his idea) were: equipped with high doors at one end; large enough for a man to enter easily; weather and pilfer proof; and bore collapsible legs, which (1) served to lock them (a) to the deck of the ship by fitting into recesses in the deck, or (b) to each other, when stacked, by reason of receiving sockets located in the upper four corners of each container, and (2) allowed sufficient clearance between deck and container or container and container for the facile insertion of a fork of a lift tractor, and (3) were equipped with lifting eyelets, which, together with a specially designed hoist, made possible placement of the containers upon or removal from a ship, railroad car or truck, while filed with cargo. The outer dimensions of the devices were such that they would fit compactly in standard gauge North American railroad cars, or narrow gauge South American trains, and in the holds of most water vessels.

World War II effectually prevented Smith from developing his conception much beyond the idea stage. Nevertheless blue prints were drawn in 1943, and in 1944, as a result of considerable publicity in trade journals and addresses delivered by Smith before trade associations, Agwilines, one of the principal New York ship operators, displayed great interest in the proposals. Certain refined features, particularly in dimensions and folding legs, were the result of discussions between Smith and Agwilines' officials.

In 1945 production started, and in the fall of that year twelve containers were used by Agwilines in an experimental run. Relative success was experienced, with the result that, by the spring of 1946, Brodin Lines, Grace Lines, Delta Lines and Stockard, in addition to Agwilines, were leasing Safeway containers. (Leathem D. Smith Shipbuilding Company was the owner of the design and manufactured the containers. Safeway Container Corporation purchased the finished containers from the shipbuilding company and leased them to shippers.)

During this period the containers were occasionally seen on the docks. However, in view of their limited number (100) this was far from an every day occurrence. Furthermore, the details of their construction could not be ascertained by casual, distant appraisal. But, in the quest for acceptance, some minor construction details were revealed in the publicity material distributed throughout the shipping trade, including: the outer dimensions, cubic and

weight capacities, placement of the lifting lugs, stacking sockets, double doors and the fact that the legs were folding. Three dimensional perspective illustrations demonstrated the use of the containers.

Up until this time the devices were of a "knock-down" variety, i. e., they could be taken apart when not in use, thus enabling the user to conserve storage space when hauling a cargo for which they were not adapted. However, in the spring of 1946, having determined that return cargoes for which the containers could be employed were generally available, and that the cost of erecting and dismantling and empty "knock-down" was greater than the cost of the hold space occupied by an empty container, the design was altered slightly so that future containers would be rigidly constructed. The first of the rigid type was placed in use in early 1947.

On June 23, 1946, Smith died in a sailing accident. The need for cash for inheritance tax purposes prompted his estate to survey his holdings for disposable assets. It was decided that the container business should be sold. Devices in process were completed but no work on new ones, was started.

Defendant was interested in the Safeway container, primarily, it appears, for use by its subsidiary, the Union Barge Lines. In October 1946 it contacted Agwilines seeking information. It watched a loading operation in which Agwilines used the box. At approximately the same time, defendant approached the shipbuilding company and inquired as to the possibility of purchase of a number of the containers. It was told to communicate with Cowan, plaintiffs' eastern representative. This it did, and, on October 29, 1946, in Pittsburgh, Cowan met with defendant's officials to discuss the proposed sale of Safeways. But, as negotiations progressed, defendant demonstrated an interest in the entire container development. Thus, what started as a meeting to discuss the purchase of individual containers ended in the possible foundation for a sale of the entire business.

Based upon this display of interest, Cowan sent detailed information to defendant concerning the business. This included: (1) patent applications for both the "knockdown" and "rigid" crates; (2) blue prints of both designs; (3) a miniature Safeway container; (4) letters of inquiry from possible users; (5) further correspondence with prospective users. In addition, defendant's representatives journeyed to Sturgeon Bay, Wisconsin, the home of the shipbuilding company, and viewed the physical plant, inventory and manufacturing operation.

Plaintiffs quoted a price of $150,000 plus a royalty of $10 per unit. This was rejected. Subsequent offers of $100,000 and $75,000 with royalties of $10 per container were also rejected. Negotiations continued until January 30, 1947, at which time defendant finally rejected plaintiffs' offer.

On January 31, 1947 defendant announced to Agwilines that it "intended to design and produce a shipping container of the widest possible utility" for "coastal steamship application * * * [and] use * * * on the inland rivers and * * * connecting highway and rail carriers." Development of the project moved rapidly, so that by February 5, 1947 defendant had set up a stock order for a freight container which was designed, by use of plaintiffs' patent applications, so as to avoid any claim of infringement. One differing feature was the use of skids and recesses running the length of the container, rather than legs and sockets as employed in plaintiffs' design. However, Agwilines rejected this design, insisting on an adaptation of plaintiffs' idea. In short defendant's final product incorporated many, if not all, of the features of plaintiffs' design. So conceived, it was accepted by the trade to the extent that, by March 1948, defendant had sold some 500 containers. Many of these sales were made to firms who had shown considerable prior interest in plaintiffs' design and had been included in the prospective users disclosed to defendant.

One particular feature of defendant's container differed from plaintiffs: its width was four inches less. As a result plaintiffs' product became obsolete. Their container could not be used interchangeably with de-

fendant's; they ceased production. Consequently the prospects of disposing of the entire operation vanished.

The foregoing is the essence of plaintiffs' cause of action. Stripped of surplusage, the averment is that defendant obtained, through a confidential relationship, knowledge of plaintiffs' secret designs, plans and prospective customers, and then wrongfully breached that confidence by using the information to its own advantage and plaintiffs' detriment.

█ Our jurisdiction of count 1 rests on the diverse citizenship of plaintiffs (citizens of Wisconsin and a Wisconsin corporation) and defendant (a Pennsylvania corporation). Eckert v. Braun, 7 Cir., 155 F.2d 517. Therefore, under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, the law of the forum, Illinois, is determinative of the substantive issues raised. And this includes the Illinois law of conflict of laws. Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477. Count 1 sounds in tort,—the misappropriation of trade secrets obtained through breach of a confidential relationship, Pidot v. Zenith Radio Corp., 1941, 308 Ill.App. 197, 31 N.E.2d 385; Aktiebolaget Bofors v. United States, 90 U.S. App.D.C. 92, 194 F.2d 145; Restatement, Torts, Sec. 757 (1939), the liability for which the courts of Illinois ascertain by the law of the place of the wrong. Whitney v. Madden, 400 Ill. 185, 79 N.E.2d 593. This is Pennsylvania, for it was there that the breach of confidence occurred by reason of defendant's employing the information acquired to its benefit and plaintiffs' detriment. Therefore, we look to the law of Pennsylvania.

In Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688, the Supreme Court of Pennsylvania painted, in broad strokes, the general picture of a claim of this nature, holding the essential elements to be: (1) existence of a trade secret, (2) communicated to the defendant (3) while he is in a position of trust and confidence and (4) use by the defendant to the injury of the plaintiff. This, then, is our broad basis for decision.

**(1) The Existence of a Trade Secret**

This is the very basis of plaintiffs' claim. They begin their search for relief with the assertion: "We possessed a trade secret." In order to ascertain whether they are correct, we must first determine just what a trade secret is and the precedent question as to what may be the subject matter of a trade secret.

█ We assume that almost any knowledge or information used in the conduct of one's business may be held by its possessor in secret. International Industries v. Warren Petroleum Corp., D.C.Del., 99 F.Supp. 907; Restatement, Torts, Sec. 757(b) (1939). Of course, as the term demands, the knowledge cannot be placed in the public domain and still be retained as a "secret". Thus, plaintiffs would not be permitted to copy the design of a known device and claim that the copies are their secret. That which has become public property cannot be recalled to privacy. However, this does not mean that the product must reach the stature of invention. Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 36 F.2d 623; Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962; A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531. All that is required is that the information or knowledge represent in some considerable degree the independent efforts of its claimant. Clearly plaintiffs' plans and customer lists fall within this broad field of knowledge and may properly be the subject matter of a trade secret. Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 60 A. 4; Chas. H. Elliott Co. v. Skillkrafters, Inc., 271 Pa. 185, 114 A. 488.

We do not understand that defendant seriously contends otherwise. Rather its position is that the structural designs of plaintiffs' containers were disclosed by (1) public use of the containers and (2) publicity material freely circulated. Thus, defendant says, at the crucial time of communication, plaintiffs' knowledge was no longer secret, it had been publicly disclosed. As to the customer lists, defendant denies their very existence.

The second of these assertions can be disposed of readily. The evidence is undis-

puted that plaintiffs had in their possession, at the time of their negotiations with defendant, original letters of inquiry from numerous shipping companies and a consequential number of files of further correspondence between plaintiffs and the inquirers. Together these comprised a valuable prospective customer list, the existence of which can in no way be challenged.

The continued secrecy of the construction plans presents a different question. The District Court entered the following finding of fact: "* * * the record shows that Plaintiffs had published to the world, through public uses of the containers and unrestricted publications by circulars and in trade magazines, complete information concerning the subject-matter with which the material [the patent applications and plans] * * * was concerned." From this the court concluded that no secrets were confidentially disclosed to defendant.

The publicity material did not, in any way, disclose plaintiffs' design. The outward dimensions were revealed, and the fact that the container employed large double doors, lifting eyelets, stacking sockets and folding legs was publicized. But this was not equivalent to a disclosure of the structural design, the engineering details, of either the container as a whole or its various working parts. These could be obtained only by careful inspection of the article and the drawings. Therefore, in this respect the finding of fact that plaintiffs had, through unrestricted publications in trade magazines and circulars, "Published * * * complete information concerning the subject", was clearly erroneous and must be set aside.

There is no dispute that 100 of plaintiffs' products had been in public use at the time of the communication. There is, however, serious debate over the legal consequences of this fact. The lower court, in refusing plaintiffs recovery, applied the following conclusion of law: "There can be no confidential disclosure where, as here, the alleged novel container was being manufactured and sold. * * * and all information concerning its construction was available from an inspection of the con-

tainer." Certain cases appear to give support to this broad statement. See, e. g., Sandlin v. Johnson, 8 Cir., 141 F.2d 660; Northup v. Reish, 7 Cir., 200 F.2d 924; Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895. But, close examination reveals that the inquiry is much deeper than whether "all information * * * was available from an inspection of the containers."

As a starting point we must look again to Pennsylvania for our guide. In Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 60 A. 4, 7, plaintiff sought to protect its secret construction design for railroad cars. These plans had been obtained by defendant through a known breach of confidence. It was urged by defendant that because it could have obtained the design from an inspection of the car (which was in public use) its use of knowledge gained through improper means would be condoned. In short, defendant suggested, as does defendant here, that the existence of a lawful means of acquiring the information precluded recovery for the employment of unlawful means. The court said:

"* * * these engineers and draftsmen * * * should have been able to measure the cars made by the company, and to produce in a short time detailed and practical drawings from which the cars could be constructed. They did not do this, for the very obvious reason that blue prints of drawings were available and were accurate. * * *"

The court then affirmed recovery for the plaintiff.

Thus, Pennsylvania will not deny recovery merely because the design could have been obtained through inspection. Rather, the inquiry in that jurisdiction appears to be: How did defendant learn of plaintiffs' design? And this, we regard as the proper test. It recognizes the very nature of the type of wrong with which we are here concerned. Confidential business information is not given protection merely as a reward to its accumulator. If the creator is entitled to reward it is available to him in the patent and copyright statutes.

Nims, Unfair Competition and Trade Marks, Sec. 142. Instead our function is that of condemning "the employment of improper means to procure the trade secret." Restatement, Torts, Sec. 757, comment. Those who gain their information improperly are brought to book in recognition of "the general principle that intentionally inflicted harm is actionable unless privileged." Protection and Use of Trade Secrets, 64 Harv.L.Rev. 976.

■■ It is unquestionably lawful for a person to gain possession, through proper means, of his competitor's product and, through inspection and analysis, create a duplicate, unless, of course, the item is patented. But the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis. "The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means." Nims, Unfair Competition and Trade Marks, Sec. 148.

This text citation is the distillate of many judicial decisions. Thus, in A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531, 538, the court said: "The mere fact that the means by which a discovery is made are obvious * * * cannot * * advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer." And in Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 36 F.2d 623, 625, this court announced: "Whether it would have been possible to have discovered and purchased the Olsen patent, without the information disclosed to appellant in confidence, it is not necessary to determine, because it is clear from the record that by a breach of confidence the information was disclosed and used as a basis for the search that was made." And in Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12, 13, this is the language: "But, because this discovery may

be possible by fair means, it would not justify a discovery by unfair means * * *."

It is, therefore, our conclusion, that the District Court applied an erroneous conclusion of law to the facts at hand. Here was no simple device, widely circulated, the construction of which was ascertainable at a glance. Cf. Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895 and Northup v. Reish, 7 Cir., 200 F.2d 924. If such were the case our problem would be simple. Instead we are concerned with a relatively complex apparatus; designed to carry large and heavy amounts of cargo; proper inspection of which was, perhaps, accessible to defendant but, in no way shown to have been made. Under such circumstances the District Court's conclusion that plaintiffs no longer possessed a trade secret at the time of their negotiations with defendant was erroneous.

(2) Communication of the Secret Information to Defendant.

■ Here we are concerned solely with a question of fact which the trial court decided adversely to plaintiffs in the following language:

"25. For the purpose of enabling Dravo to appraise the worth of the Safeway Container business, Cowan sent Dravo a model, several patent applications, an unassorted group of letters from users and potential users, a report of its patent attorney * * * and several drawings."

"28. Out of the thousands of pages of papers in the many exhibits introduced by Plaintiffs * * * it is impossible to determine what particular papers or drawings, referred to in finding 25, were sent * * * to the Defendant * * *."

In this context, finding 28 was equivalent to a finding that plaintiffs had failed to prove communication of the secret information to defendant. And, of course, this was fatal to plaintiffs' case. We think the finding is clearly erroneous for the following reasons. First, defendant stipulated prior to trial that it had received plaintiffs' exhibits 46, which is the application for a patent on the rigid container, and 47–1

through 47-38, which are original letters of inquiry and further correspondence files. Secondly, plaintiffs' exhibit 56 is a letter from defendant to Cowan notifying the latter of the return to plaintiffs, by defendant, of (1) patent applications relating to the containers, (2) correspondence files, (3) a miniature Safeway container and (4) "drawings". These drawings were identified by the testimony of Stearn and Cowan as plaintiffs' exhibit 53, blue prints of both the "knock-down" and "rigid" containers. Thus, by stipulation and a letter, supplemented in slight detail by plaintiffs' witnesses, defendant admitted receipt, at the time of the negotiations, of the information upon which plaintiffs predicated their case and which we have herein held to have been secret information.

### (3) Was Defendant in a Position of Trust and Confidence at the Time of the Disclosure?

Mr. Justice Holmes once said that the existence of the confidential relationship is the "starting point" in a cause of action such as this. E. I. DuPont de Nemours Powder Co., v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016. While we take a slightly different tack, there is no doubt as to the importance of this element of plaintiffs' case.

Certain it is that a non-confidential disclosure will not supply the basis for a law suit. Plaintiffs' information is afforded protection because it is secret. Promiscuous disclosures quite naturally destroy the secrecy and the corresponding protection. But this is not true where a confidence has been reposed carrying with it communication of an idea.

It is clear that no express promise of trust was exacted from defendant. There is, however, the further question of whether one was implied from the relationship of the parties. Pennsylvania has not provided us with a decision precisely in point but Pressed Steel Car Co. v. Standard Car Co., 210 Pa. 464, 60 A. 4, furnishes abundant guideposts. There plaintiff delivered its blue prints to customers in order that they might acquaint themselves more thoroughly with the railroad cars they were purchasing; from these customers, defendant obtained the drawings. In holding that the customers held the plans as a result of a confidence reposed in them by plaintiff, and that the confidence was breached by delivery of the blue prints to defendant, the court said, 60 A. at page 10:

> "While there was no expressed restriction placed on the ownership of the prints, or any expressed limitation as to the use to which they were to be put, it is clear * * * that the purpose for which they were delivered by the plaintiff was understood by all parties. * * *"

See also Belmont Laboratories v. Heist, 300 Pa. 542, 151 A. 15; Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688; Andrews Co., Inc. v. Freidman, 26 Pa.Dist. R. 843, and Kortenhaus v. American Watch Co., 1 Lanc.Law.Rev. 275, 17 Phila. 134, recognizing implied confidential relationships in other situations.

The quoted language is applicable and determinative. Here plaintiffs disclosed their design for one purpose, to enable defendant to appraise it with a view in mind of purchasing the business. There can be no question that defendant knew and understood this limited purpose. Trust was reposed in it by plaintiffs that the information thus transmitted would be accepted subject to that limitation. "[T]he first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good." E. I. DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100 at page 102, 37 S.Ct. 575, at page 576, 61 L.Ed. 1016.

Nor is it an adequate answer for defendant to say that the transactions with plaintiffs were at arms length. So, too, were the overall dealings between plaintiffs and defendants in Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962; Allen-Qualley Co. v. Shellmar Products Co., D.C., 31 F.2d 293, affirmed, 7 Cir., 36 F.2d 623 and Schavoir v. American Rebonded Leather Co., 104 Conn.

472, 133 A. 582. That fact does not detract from the conclusion that but for those very transactions defendant would not have learned, from plaintiffs, of the container design. The implied limitation on the use to be made of the information had its roots in the "arms-length" transaction.

### (4) The Improper Use by Defendant of the Secret Information.

■ Defendant's own evidence discloses that it did not begin to design its container until after it had access to plaintiffs' plans. Defendant's engineers admittedly referred to plaintiffs' patent applications, as they said, to avoid infringement. It is not disputed that, at the urging of Agwilines, defendant revised its proposed design to incorporate the folding leg and socket principles of plaintiffs' containers. These evidentiary facts, together with the striking similarity between defendant's and plaintiffs' finished product, were more than enough to convict defendant of the improper use of the structural information obtained from plaintiffs.

As a general rule the similarity standing alone is an adequate basis upon which to find misappropriation. Thus, in Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 924, the court said:

> "The similarity of defendant's device to that of complainant is strong proof that one was copied from the other".

From Belmont Laboratories v. Heist, 300 Pa. 542, 151 A. 15, it appears that Pennsylvania shares this view. See also Chesapeake & O. Ry. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801; Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962. There can be no doubt that the designs shown defendant by plaintiffs found realization in defendant's product.

We have not overlooked the question of misuse of the customer lists. They were received by defendant subject to the same limitations as were the structural plans. However, the evidence is such that we are unable to determine whether defendant used them improperly. Through the introduction of evidence during their case in chief plaintiffs established that these lists had been delivered to defendant. Plaintiffs argue that the fact that defendant subsequently sold containers to some of the companies included in the correspondence files was conclusive proof of improper appropriation. But defendant demonstrated that the names of these same shipping companies were available in any telephone book. While identity in customers is of some probative value on this issue, it is not so compelling as the similarity between the containers. Plaintiffs recognized this weakness. Therefore, on rebuttal, they sought to introduce evidence to the effect that defendant had made photostatic copies of the customer files. The trial court excluded the proof on the ground that it should have been presented during the case in chief. Plaintiffs have assigned this ruling as error.

■ Looking at the evidence against an outline of a perfectly tried lawsuit, it was part of the case in chief. But we are of the opinion that, despite this fact, the District Court should have heard the testimony. It was, after all, concerned with ascertaining the true facts in a sharp dispute. Had this evidence been merely cumulative we might take a different view of its exclusion. But it stood alone serving to prove the very heart of plaintiffs' case with respect to the customer lists. In the exercise of its sound judicial discretion the court should have admitted this evidence.

Plaintiffs also alleged that defendant had, by implication, promised to refrain from entering the shipping container business, and had engaged in acts tending to disparage plaintiffs' name and position in the field. Injunctive relief and damages were sought. Full discussion of these issues would only serve to lengthen an already too lengthy memorandum. We think it sufficient to say that the evidence does not warrant a finding for plaintiffs on these averments. So, too, at this juncture, we should observe that the theory advanced by plaintiffs in count 1 of their complaint was the proper ground for recovery. The dismissal of count 2 was proper.

■ All that remains in this branch of the case is to outline the relief to which plaintiffs are entitled. Initially defendant must be enjoined from making further use

of the information received from plaintiffs in confidence. Allen-Qualley Co. v. Shellmar Products Co., D.C., 31 F.2d 293, affirmed, 7 Cir., 36 F.2d 623; Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 60 A. 4. This may be accomplished by enjoining further production and sale of shipping containers incorporating plaintiffs' design. However, we do not think it necessary that the equipment used by defendant in this venture be destroyed. It may be that it is adaptable to other purposes. The injunction against continued use of the secret information should adequately protect plaintiffs in the future. Nor should defendant be totally restrained from continuing to engage in the container business. The injunctive relief should be restricted to the benefits flowing from the breach of the confidential relationship.

The record discloses that the taking of evidence relating to monetary recovery was deferred until after the presentation of the proof upon the issues herein discussed. Consequently the cause must be remanded for the purpose of hearing such evidence as the parties desire to present on this issue. However, we deem it proper to suggest that, in our opinion, plaintiffs are entitled to recover (1) the loss suffered with respect to their investment, Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972 and (2) the profits realized by defendant as a result of the use of plaintiffs' design. Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962. There is, however, no basis upon which a

threefold award of damages can be made. Nor are plaintiffs entitled to attorney's fees. Upon remand, the District Court should hear the evidence relating to the question of misuse of plaintiffs' customer lists and enter findings in accordance therewith. Any relief granted with reference thereto should be in accord with the views expressed herein.

Counts 3 and 4 charged defendant with infringement of plaintiffs' patents to Smith, 2,457,841 and 2,457,842, issued January 4, 1949, to which we shall refer as '841 and '842. Claim 1 of each patent, which is illustrative of the alleged invention, appears in the footnote.[1] However, it should be observed, for example, that certain claims are concerned specifically with an eyelet provided in the socket; others, with a double base stackable folding leg and still others, with the interlocking stackable character of the containers. Each patent embraces in its various claims different facets of the same conception.

The applicant recognized that containers for carrying merchandise direct from shipper to consignee, irrespective of the mode of conveyance used, were old in the art, but said that such shipping means had been provided for use mostly on railroads, in order to handle, in less than carload lots, goods which may be loaded into the cars already packed in the several separate containers. He suggested such a container capable of use on either railroads or ships. He claimed, as one object, utilization of

1. A freight container comprising a body having top, bottom and side walls, legs depending from said body, upwardly open leg sockets permanently mounted in the upper part of said container each in vertical alignment with a depending leg for seating similar legs of another container from lateral movement in any direction, and a lifting eyelet mounted within the recess of each leg socket and adjacent to the side walls of said sockets.

A fabricated metal freight container having a right parallelepiped shape comprising a rectangular bottom, a column vertically mounted on the bottom at each corner thereof, a leg pivotal around a horizontal shaft mounted on the bottom in vertical alignment with each column, two bases on each leg angularly spaced from each other with respect to the shaft and each in the same vertical line when in effective position, one base being at a greater distance from the shaft than the other base, each base being spaced from the container bottom when in effective position, an upwardly open leg socket rigidly mounted on the top of each column in vertical alignment with whichever depending leg base is in effective position, side walls on said sockets which cooperatively engage either base of the legs of a superposed similar container and hold the legs and the container against lateral movement in any direction, side walls joining the columns and their superposed leg sockets to each other, and a top joining the top edges of the sidewalls and the top of the leg sockets to each other.

"the legs of a container as the sole means of preventing lateral and tilting movement of the container" when resting on another below it. In other words, he prescribed four legs, one on each corner of the container, fitting firmly into four reciprocal receptacles on the top of the one below, thus preventing shifting in any direction. A further object, the applicant said, was to provide "flexibility in the over-all height" of the container, by providing "a folding leg which will support the container at either of two heights" and "so designed that it will seat in the leg sockets regardless of its position." Paraphrasing plaintiffs' counsel's assertions with relation to the two patents, the patentee prescribed, as one feature, sockets to receive the superimposed container's legs. These were to be opensided, because of alleged important advantages. First of all, so designed, that feature, it is said, made more facile loading by crane or truck. The patentee asserted a further advantage in that the opensided socket is self-cleaning, avoiding the dirt and refuse that would naturally collect in sockets with all sides closed. He said that an advantage lies also in the fact that his eyelets, recessed in the sockets, facilitate stacking without breaking. He insisted that if the eyelet extends outwardly or upwardly from the body of the container it may easily be damaged; therefore, he recessed it in one wall of the socket, made it a part thereof and so arranged it that it engaged the descending leg.

An important feature of Smith's container, as asserted by plaintiffs, is the folding leg. As admitted by the applicant, a former container had been built with legs so tall as to provide a space, perhaps a foot high, underneath the container, thus permitting insertion of a truck or other means of transportation underneath. Smith claimed to have avoided this allegedly excessive height, which he said was undesirable in stacking containers, by providing a folding leg which seats itself in the socket of the lower container, where it comes to rest in either the open or the folded position. Such, shortly, were the claimed objects of the invention and such the asserted novel features of Smith's device.

We are dealing with a rather crowded art. Smith's alleged invention arises from the improvements which he suggests. Whether he achieved patentable invention depends largely upon whether what he did was taught by the prior art, which is rather prolific.

Kirchner, 1,252,810 discloses a similar shipping metal container, having hinged doors designed to hold less than carload lots of freight. Patent 1,407,595 to Alfred H. Smith shows such a container, so designed as to be capable of being stacked one on another and equipped with lugs which make it possible to lift the container and are also designed to hold one container upon another in such a manner as to prevent its shifting in either direction when stacked. Fitch, 1,485,972, places in his container lifting lugs, which are recessed in the top of the unit in a manner not dissimilar to that shown in Smith's '842 so that they do not project beyond the walls of the container.

Romine 1,688,437 provides a high central top and a ledge at each side thereof, with legs projecting from the bottom of the box, said to be readily detachable. He discloses the idea of supporting the container either on legs which are extended or on projecting elements to which the legs are secured, depending on whether a high or low support is desired. Smith, in the patents in suit, prescribes in this respect his combination of the two elements in one folding leg. In Turner 1,742,738 the corners of the containers when stacked are interfitting. Harbord 1,830,998 shows a freight handling device with a folded leg, so hinged that it may project downwardly to hold the freight containing device elevated above the floor, or so that it can be swung upwardly to a horizontal position, in which position it sits more closely upon the floor. In other words, the folded leg was used by Harbord. It would seem to be of little or no significance that the device upon which it was used was somewhat dissimilar to that prescribed by Smith.

Woodruff 1,847,158 provides a metal box supported on tapered legs not greatly unlike Smith's. Olds 1,900,867 shows projecting

legs on the bottom of containers with rollers adapted to be received in recessed trackways. This patentee also employed sockets at two of its diagonally opposite corners into which a lug or other projection of a superimposed container may enter. Furthermore, his lifting lugs are recessed in the walls of the container so as to avoid projection beyond.

Miller 2,399,499 of April 30, 1946, granted on an application filed May 22, 1943, thus, we think, preceding Smith, provides notched-out corners which accommodate the legs of a superimposed container. The only difference is that the sockets in Miller's patent are not recessed into the cavity of the container itself as are Smith's. Miller suggests also steps or shoulders along each side, instead of sockets at the corners, arranged so that the containers will nest together closely when stacked one on the other. The Dutch patent 32,631 also discloses containers stacked one upon the other, with notched corner posts providing the interfitting engagement of one container on and with another. Other patents, including O'Connor, Fitch 1,404,947, Smith 1,451,-633 and Koll 1,862,450 contain suggestions pertaining closely to this art with all of which Smith, of course, was bound to be familiar.

The trial court had before it, in addition to these patents, a number of publications dealing with shipping containers. In one, the author discussed the desirability of using legs as compared with skids or slides and showed how containers may be constructed with steps or recesses on the top edges to accommodate legs or skids on the bottom edges of a superimposed container. Another, as early as 1932, commented that "the containers can be stacked one on another by means of four recesses into which the legs of the container sit." In addition to the foregoing evidence there was extended parol evidence concerning the art and its application to the patents and to the prior devices. Thus it will be seen that in the prior art the builders of shipping containers had encountered the problem of so stacking them as to prevent shifting, of so placing lugs as not to be easily broken in

use, and of providing either legs or other devices to fit in sockets on the top of another when they are stacked together.

■■■ After hearing all the evidence the court concluded that the patents were invalid for want of patentable invention. We have examined the evidence and think that the court's finding of invalidity is supported by adequate, ample substantial evidence. At any rate the evidence was such that we can not say that the finding was clearly erroneous. See Graver Tank & Manufacturing Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Holland Co. v. American Steel Foundries Co., 7 Cir., 196 F.2d 749; Minnesota Mining & Manufacturing Co. v. International Plastic Corp., 7 Cir., 159 F.2d 554.

We have seen that Smith claimed invention by improvement of old containers by providing (1) recessed opensided sockets to receive the legs of the superimposed container; (2) lifting "eyelets," recessed in the sockets, so as not to project beyond the contour of the container, thus preventing breakage, and (3) folding legs, resting firmly in the sockets of the lower container, in either the open or the folded position, so as to prevent shifting and to permit flexibility in over-all height. We find in containers of the prior art, recessed lifting lugs, (eyelets); means for preventing shifting, consisting of legs, steps and ledges, fitting into corresponding reciprocal receiving means provided in the top of the lower container; variation of the height of such non-shifting means, and folding legs. True, in no one of the prior art references were all these features combined and no one publication taught the specific form of the features disclosed by Smith. But the delver in the art was bound to know all the teachings of that art. When he attempted to improve upon the things taught by others, if he was to achieve patentable invention, he was under the necessity of doing more than merely adapting the teaching to a device as a skilled mechanic would do. After careful consideration, we agree with the District Court that the patentee did no more than adapt what he had been taught to an

improved container and that his accomplishment did not rise to the height of patentable invention as that term has been defined by the Supreme Court. Great Atlantic and Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. Choice of mechanical details is not ordinarily invention. Enterprise Ry. Equipment Co. v. Pullman Standard Car Mfg. Co., 7 Cir., 95 F.2d 17; Less Car Load Lots Co. v. Pennsylvania R. R. Co., D.C., 10 F.Supp. 642, affirmed, 2 Cir., 80 F.2d 1015. The evidence here is such that, though the prior art does not completely anticipate the patents in suit, what the patentee learned therefrom was sufficient to teach him as a skilled container builder everything he disclosed. See Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S. Ct. 662, 82 L.Ed. 1008, Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334 and Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58.

The provision in the recent codification of patent law, 35 U.S.C. § 282 that a patent shall be presumed to be valid and that the burden of establishing invalidity shall be on the party asserting it, even if applicable, see Sec. 4(e) of Act July 19, 1952, c. 950, 66 Stat. 815, 35 U.S.C.A. note preceding section 1, which we do not decide, does not impinge upon our conclusion.

Plaintiffs assert that if defendant is liable for breach of confidential relations, it is estopped to plead invalidity of the patents. The decisions cited in support, we think, do not sustain the argument. The two causes of action are entirely separate; finding of guilt upon the first two counts can in no wise affect the question of validity of the patents under counts 3 and 4. In Booth v. Stutz Motor Co., 7 Cir., 56 F. 2d 962, we held the patent invalid but nevertheless defendant was liable for breach of a confidential relationship. Similar was the ruling in Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921. We find in the record nothing to estop defendant from asserting invalidity. After mature consideration we conclude that the judgment on counts 3 and 4 must be affirmed.

The judgment upon count 1 is reversed; the judgment upon counts 2, 3 and 4 is affirmed. The cause is remanded to the District Court with direction to proceed in accord with the announcements herein.